## Case of M'NAIR'S Appeal.

### APPEAL.

There is a distinction between the liabilities of executors with respect to creditors, and those with respect to legatees; and there are many cases in which they would be discharged as against the latter, though not as against the former.

So long as executors manage the estate of their testator in accordance with the ideas which he himself entertained of it, and do nothing but what there is reason to believe he would have approved, could he have been consulted, it *seems* they are not responsible for losses as respects *legatees ; aliter*, as respects *creditors*.

Testator made a will of which he' appointed his three sons *A.*, *B.* and *C.*, executors, and directed that two of his sons *A.* and *B.*, should put out to interest for the use of his daughter *R.*, two thousand six hundred and sixty-seven dollars of his estate, "on land security, or otherwise render it safe and productive, and pay the proceeds thereof to her from time to time, as they in their wisdom should judge most for her benefit." Among the assets which came into the hands of the executors, was a bond given to the testator by *G. S.* and his father *J. S.*, in which the latter was surety. The bond was dated in the year 1810. In 1813, at a meeting of the creditors of *G. S.* an offer was made to the testator to pay off the bond, which he declined, saying he did not wish it paid during his life; he only wanted the interest. He continued to receive the interest until his death in 1816. *J. S.* the surety in the bond, died in 1818, leaving a large estate. A suit was afterwards brought against his executors to recover the amount of the bond, but it was adjudged to be a joint and not a several bond, and that therefore there could be no recovery against the estate of *J. S.* as *G. S.* had survived him. *G. S.* became insolvent about the year 1817, and the money was lost. There was some evidence to shew, that about a year after the death of the testator, one of the legatees offered to take the bond as part of her share of the estate, which *A.*, one of the executors, would not agree to, intimating that he wished to retain it as a part of the fund to be set apart for the use of the testator's daughter *R.* It also appeared that *G. S.* in the year 1820, offered to *A.*, one of the executors, in satisfaction of the bond in question, a bond and mortgage on certain lands in *Steuben* county, *New York*, but it was not shown what was his title to the lands, nor what was their value, and the offer was refused. The executors appeared to have acted with good faith throughout the whole business, and in the suits instituted on the bond in controversy, acted under the advice of eminent counsel. *Held*, that under the particular circumstances of the case, of which the above are the principal, they were not responsible to legatees for the loss of the bond, and that they were entitled to credit for the expense they incurred in endeavouring to collect it.

THIS case came before the court on an appeal from the decision of the Circuit Court of *Montgomery* County, held by the Chief Justice in *March*, 1832, reversing the decree of the Orphan's Court of that county on the settlement of the accounts of the executors of *Samuel M'Nair*, deceased.

*Samuel M'Nair* died in the year 1816, leaving a will, which bore date the 15th of *April*, 1816, and was proved on the 16th of *May*, following.

By this will, after certain legacies and devises which need not be mentioned, and giving to his wife an estate for life in a portion of his real estate, he directed his two sons, *John M'Nair* and *Samuel M'Nair*, or the survivor of them, to take, receive and hold, out of his personal estate, two thousand six hundred and sixty-seven dollars (if so much should remain after payment of debts, funeral expenses,

(Case of M'Nair's appeal.)

and legacies), and to put the same to interest on land security, or otherwise render it safe and productive, and pay the interest thereof from time to time (as they in their wisdom should judge most for her benefit) to his daughter *Rebecca M'Nair*, and if there should not be a sufficiency of personal estate for that purpose, he directed that his said two sons should put to interest whatever sum might be derived from that source, and do with it in all respects as before directed; and he further directed, that at the decease of his wife, his executors, or the survivors or survivor of them, should sell at public sale the sixty-one acres devised to her, and out of the price thereof make up the deficiency, so that from and after that time, *Rebecca* should receive the interest of the whole sum of two thousand six hundred and sixty-seven dollars, in the manner, and under the restrictions aforesaid, (except a deduction of reasonable commissions to his two sons *John* and *Samuel* for their trouble) during her natural life, and that after her decease, the said sum of two thousand six hundred and sixty-seven dollars, should be paid to his two daughters *Ann Craven* and *Mary Long*, in equal shares.

Of this will the testator appointed his three sons *John, Samuel,* and *James M'Nair*, executors.

On the second of *July*, 1827, the executors settled an account in the Register's Office, from which it appeared, that the personal estate of the testator amounted to seven thousand three hundred and eighty-eight dollars and eighty-six cents, and the proceeds of his real estate to the sum of eleven thousand one hundred and forty-six dollars and twenty-five cents, making a total of eighteen thousand five hundred and thirty-five dollars and eleven cents, and after deducting the credits taken by them including commissions at five per cent on four thousand seven hundred and twenty-one dollars and eighty-six cents, "the amount actually received of the personal estate," and at two and a half per cent on the proceeds of the real estate, there remained a balance in their hands of fourteen thousand and thirty dollars and seventy cents.

This balance they account for by taking credit

1st, For the amount of a bond charged in the inventory as due from *George S. Shelmire*, now at issue in the Supreme Court, $1382 70

2nd, For the balance of a bond due from the estate of *James Allison*, not proceeded in by the consent of the legatees, 186 67

3rd, For the amount bequeathed in trust for *Rebecca M'Nair*, 2667 00

4th, For the bonds of *Hugh Long* and *Ann Craven*, for the purchase money of the real estate, 11146 25

$15382 62

The account thus settled was referred to auditors, who reduced the commissions charged on the proceeds of the real estate to one per cent; disallowed some other credits claimed by the executors, and found a balance in their hands of fourteen thousand two hundred and eighty-four dollars and thirty-three cents, which they reported had been duly accounted for in the manner above stated.

Exceptions were filed to this report by *Hugh Long*, the husband of one of the legatees named in the will, of which the following only are now material ; *viz.*

1st, The auditors have stated that the executors have accounted for the balance found in favour of the estate by the amount of a bond charged in the inventory as due from *George S. Shelmire*, now at issue in the Supreme Court, for one thousand three hundred and eighty-two dollars and seventy cents, while in fact there is no such bond in the inventory ; but the auditors are supposed to intend a certain bond mentioned in the inventory given by *John Shelmire* and *George S. Shelmire* to the deceased, conditioned for the payment of one thousand three hundred dollars with interest due theron at the time of the decedent's death, amounting to eighty-two dollars and seventy cents, no part of which bond or interest has been accounted for, inasmuch as the accountants have already received the said sum of eighty-two dollars and seventy cents and not accounted for it, and therefore cannot recover it in the suit alluded to, and as to the principal of the said bond, they are not entitled to any credit for it in this account, nor can they at any time hereafter be entitled to any credit for it as executors, inasmuch as the said *John* and *Samuel M'Nair* took the bond upon themselves as trustees of *Rebeca M'Nair* under the will, for her use, and refused to collect it, or to deliver it to the legatees for collection.

2. The auditors have allowed the executors credit for expenses in endeavouring to collect the said bond, incurred after the said *John* and *Samuel M'Nair*, as trustees of *Rebecca M'Nair*, had taken it upon themselves for her use.

Exceptions were also filed by the executors to so much of the auditor's report as disallowed commissions on that part of the personal estate which was set apart for the trustees of *Rebecca M'Nair*, and reduced the commissions on the proceeds of the real estate from two and a half to one per cent.

The bond which was the subject of dispute between the parties bore date the 2nd *April*, 1810, and was executed by *George S. Shelmire* as principal debtor, and *John Shelmire* as surety, to *Samuel M'Nair*, in the penal sum of two thousand six hundred dollars, conditioned for the payment of thirteen hundred dollars. In the obligatory part the bond was joint, but the condition provided, that if the said *George S. Shelmire* and *John Shelmire* " *or either of them, their heirs, executors, administrators, or any of them, shall and do well and truly pay*," &c. then the bond to be void.

From the evidence exhibited to the Orphan's Court it appeared, that in the year 1817, *George S. Shelmire* was in embarrassed circumstances and removed to the western part of the state of *New York*. *John Shelmire* died on the 6th of *April*, 1818. To *November* Term, 1818, a suit was brought upon the bond above referred to, by the executors of *Samuel M'Nair*, against the executors of *John Shelmire*, in the Court of Common Pleas of *Bucks* County, in which a nonsuit was afterwards entered. In the management of this suit, the plaintiffs acted under the advice of eminent counsel, who were of opinion that the bond was joint and several, and that a recovery on it might be had from the estate of *John Shelmire*.

To *August* Term, 1822, the executors of *Samuel M'Nair* brought suit on the bond against *George S. Shelmire* in the Court of Common Pleas of *Ontario* county, in the state of *New York*, in which they obtained judgment, and issued a *fieri facias* and *ca. sa.* against him, which were returned respectively *nulla bona,* and *non est inventus.*

In the year 1824, *George S. Shelmire* was discharged under the insolvent laws of the state of *New York.*

To *April* Term, 1825, the executors of *Samuel M'Nair* brought another suit on the bond against the executors of *John Shelmire*, in the Court of Common Pleas of *Bucks* County. The cause was removed to the Circuit Court of that county, where it was tried on the 12th of *February*, 1828, before Judge HUSTON, who having instructed the jury that the bond was joint, and not joint and several, they found a verdict for the defendants. The cause was tried for the plaintiffs by eminent counsel, but no appeal was taken from the judgment of the Circuit Court.

Preparatory to the hearing before the Orphan's Court, the depositions of several witnesses were taken, from which it appeared, that in the year 1813, *Samuel M'Nair*, the testator, and the other creditors of *George S. Shelmire*, met at the house of the latter for the purpose of receiving their debts. *Samuel M'Nair* declined receiving his, declaring that he did not wish it paid during his life; the interest was all he required. Shortly after the death of *John Shelmire*, *James M'Nair*, one of the executors of *Samuel M'Nair*, called on the Revd. Mr. *Montayne*, who was one of the executors of *John Shelmire*, and was examined as a witness in this cause, and gave him notice of the bond in question. Mr. *Montayne* asked him if he had called on his testator in his lifetime, to which *M'Nair* answered, that he had not. *Montayne* then inquired, whether the interest had been paid up, and by whom? *M'Nair* replied, that the interest had been paid up to 1817, by *George S. Shelmire*. Mr. *Montayne* then asked him, why they had not collected the principal, adding, that there had been a lapse of almost two years between the death of *Samuel M'Nair* and that of *John Shelmire:* that *George S. Shelmire* had been able to pay the bond at any time within a year after the death of *Samuel M'Nair*, and that he (*Montayne*) did not hold himself accountable; but nevertheless, if they would pursue

*George S. Shelmire,* and failed to recover from him, he, (*Montayne*) would pay the bond.   *M'Nair* replied, that he had nothing to do with *George S. Shelmire.*

Mr. *Montayne,* in the course of his examination stated, that at a meeting of the auditors at *Willow Grove,* he heard *Samuel Hart* (who was the attorney in fact of *Ann Craven*) or *Hugh Long,* say, that they had been willing, at the time the meeting took place to distribute the legacies, to receive the bond in question and that he understood, at the audit, from all the parties, that there had been a time, when the legatees were willing to receive the bond, but the executors would not give it to them.   Another witness stated that at this audit the executors admitted that they had received two years interest on the bond after the death of *Samuel M'Nair,* and also admitted that the legatees had offered about one year after the death of *Samuel M'Nair* to take the *Shelmire* bond as part of their share of the estate.   The reason given by *John M'Nair* for retaining the bond was, that he had money on hand of which he would lose the interest, if he did not pay it to his sister *Ann Craven.   Samuel* and *James M'Nair* agreed that *Ann Craven* should have the bond at that time, but *John* objected, and said they would keep it; it was a good bond.   One of the auditors who was examined in reference to what took place before them, testified, that he understood that the executors refused to give the bond to the legatees because they were not indemnified.   To another witness, *John M'Nair* said, in a conversation which took place in the year 1817 or 1818, that he considered the bond good and had not a mind to part with it; he allowed Squire *Shelmire's* property was able for it.

From the evidence of Mr. *Montayne* it appeared, that *George S. Shelmire* was entitled, as one of the heirs of his father, to one eighth of eighty-nine acres and twenty-nine perches of land, worth about fifty dollars an acre.   He had received about twelve hundred dollars in his father's lifetime and would be entitled to about six hundred and fifty dollars more, provided the land brought fifty dollars an acre.

He assigned his interest in his father's estate to *James Vansant,* to secure a debt of one thousand and forty dollars due to him from *George S.* and *John Shelmire,* for which the latter was surety.   This assignment was exhibited to Mr. *Montayne,* who afterwards received notice from the executors of *Samuel M'Nair* not to pay over the money to *Vansant.*   This he agreed to provided they would save him harmless, which they refused to do.   He was afterwards served with a foreign attachment in which the executors of *Samuel M'Nair* were plaintiffs.

In the years 1814, 1815, 1816, and during part of 1817, *George S. Shelmire* was doing a large business in *Philadelphia.*   He became embarrassed in 1817, and went to reside in the state of *New York.* In the year 1820, he offered to *John M'Nair,* in satisfaction of the *Shelmire* bond, a bond and mortgage on lands in *Steuben* county, in the state of *New York,* which he alleged he held in company with

(Case of M'Nair's appeal.)

*William Folwell,* and exhibited certificates, to shew that the land was clear of incumbrances. *John M'Nair* declined the offer, on the ground that the land was too distant, and he did not know the value of it.

The auditors to whom the accounts were referred, were satisfied that all proper exertions had been made by the executors to collect the bond, and under this belief and a conviction of the insolvency of *George S. Shelmire,* they gave them credit for the amount of the bond with the interest due upon it, and also for the expenses incurred in endeavouring to collect it.

On the 29th of *May,* 1828, the Orphan's Court made a decree, disallowing the credit of one thousand three hundred and eighty-two dollars and seventy cents, given by the auditors to the executors, being the amount of the *Shelmire* bond with interest, and also the expenses incurred in endeavouring to collect it, amounting to one hundred and seventy-six dollars and eleven cents, on the ground that they had been incurred after the executors had taken it upon themselves, and refused to give it to the legatees, to be collected at their own expense.

The account was then referred to another auditor by whom it was corrected and re-stated in conformity with the decision of the court, and a final decree made confirming the report of the auditor.

From this decree the executors of *Samuel M'Nair* appealed to the Circuit Court, where the following exceptions were filed to the decree of the Orphan's Court:

1. The Orphan's Court erred in refusing to allow the executors credit for one thousand three hundred and eighty-two dollars and seventy cents, the principal and interest of the bond of *George S. Shelmire* and *John Shelmire,* which they were unable to recover.

2. The Orphan's Court erred in refusing to allow them credit for the money expended in the effort to collect the said bond.

3. The Orphan's Court erred in allowing the executors commissions on only four thousand seven hundred and twenty-one dollars and eighty-six cents, instead of five thousand eight hundred and nineteen dollars and forty-two cents, the amount of personal estate actually received by them.

4. The Orphan's Court erred in allowing the executors a commission of one per cent only on the proceeds of the real estate, instead of a commission of two and a half per cent.

The Circuit Court reversed the decree of the Orphan's Court as to the first and second exceptions, and affirmed it as to the rest. An appeal was then taken to the Supreme Court on behalf of *Ann Craven* and *Hugh Long.*

*Kittera* for the appellants, cited *Gordon's Law of Decedents,* 264. 2 *Br. Ch. Rep.* 156. 1 *Chitty's Eq. Dig.* 401. 5 *Ves.* 844. 6 *Madd.* 13.

*Rawle, Jun.* for the appellees, cited *Konigmacher* v. *Kimmel*, 1 *Penn. Rep.* 207. *King* v. *Morrison, Id.* 188. *Bonsall's Appeal*, 1 *Rawle*, 266. *Osgood* v. *Franklin*, 2 *John. Ch. Rep.* 80. *Thompson* v. *Brown*, 4 *John Ch. Rep.* 619. 626, 627. 1 *Hopk. Ch. Rep.* 233. *Geddis* v. *Hawk*, 10 *Serg. & Rawle*, 33. *Besore* v. *Potter*, 12 *Serg. & Rawle*, 154. *Bishop* v. *Church*, 2 *Ves.* 101. 371. *Weaver* v. *Shryork*, 6 *Serg. & Rawle*, 265, 266. *Moser* v. *Libenguth*, 2 *Rawle*, 428.

The opinion of the court was delivered by

Kennedy, J.—It is proper to observe, that the contest in this case is between the executors and legatees, and not with the creditors of the testator. And although Lord Thurlow, in *Saddler* v. *Hobbs*, 2 *Bro. Ch. Rep.* 117, seemed to think it an odd distinction that a creditor should have a right to charge an executor when legatees should not, and Mr. *Toller*, in his treatise on the *Law of Executors and Administrators*, 484, has said, that it appeared to rest on no authority, its existence is recognised in 2 *Fonb.* 83-84, and acted upon in several cases. In *Gibbs* v. *Herring, Pre. Ch.* 49, the distinction is taken, and the decision of the case professes to be founded upon it. The court say, " the executrix shall not make it good to the *plaintiffs who were to have a share of the estate* by the custom of the province of York, but against a creditor she should." In *Churchhill* v. *Lady Hobson*. 1 *P. Wms.*, 243, the distinction is expressly taken by Lord Chancellor Harcourt, and given by him as the reason and ground of his decision in that case. Lord Northington in *Westley* v. *Clark*, 1 *Eden.* 357, S. C. in note 1 *P. Wms.*, 83, if he does not sustain the distinction, decided that two executors who joined a third in giving a receipt for money received by him alone, should not be liable to the *legatees* for it, which is directly contrary to what Lord Thurlow considered was the rule as to executors. And in *Bacon* v. *Bacon*, 5 *Ves.* 331, an executor who lived in town gave twelve hundred pounds to his co-executor to pay a list of debts made out and represented by the co-executor to be owing by the testator in the country, where he resided at the time of his death, was discharged from a loss of more than four hundred pounds of the money, arising from the misapplication and insolvency of the co-executor. It appeared there, that the co-executor lived in the country, where he said the debts were owing, and where in fact debts of considerable amount were known to exist by the executor giving the money; that the co-executor had been the confidential agent and attorney of the testator in his lifetime for many years, and had been entrusted with the receipt and payment of large sums of money by him. And as a direct and binding authority upon this court, we have the decision of it made as early as 1788, in the case of *Brown's Appeal*, 1 *Dall.* 311, where one executor, who had received money belonging to the estate of the testator, and paid it over to his co-executor, who became insolvent,

(Case of M'Nair's appeal.)

was held not to be answerable to *legatees*, although, as the court say, he would have been chargeable to creditors, if there had been any.

In the case of *Gibbs* v. *Herring*, it appeared that the testator in his lifetime had entrusted *J. S.* with several sums of money, to dispose of at interest for him, and died while part of it was still in his hands undisposed of. The executrix, however, instead of taking the money out of the hands of *J. S.*, directed him to put it out at interest, which he accordingly did, on security that proved deficient, and yet she was held not liable for the loss of it to the legatees. The resemblance of this case to the one under consideration is, as it appears to me, very striking. The confidence of the testator in the goodness of his security for the debt due upon the bond, with the accruing interest, shown in the one case by his refusing to receive the principal, saying he "did not wish it paid during his life, the interest was all that he required," is fully equivalent to the confidence of the testator evinced in the other case, in the integrity and responsibility of *J. S.*, by entrusting and leaving his money in his hands to be put to interest on such security as he might think good. Beside, executors have always been permitted to exercise their discretion upon such subjects; for Lord-keeper HARCOURT in *Brown* v. *Litton*, 1 *P. Wms.* 141, lays it down, that where an executor puts out money, though without the indemnity of a decree, upon a real security which there was no reason then to suspect, but afterwards such security proves bad, he is not accountable for the loss.

Lord REDESDALE, who was disposed to hold a pretty tight rein upon executors, was unwilling to lay down the rule positively that there was no case where the strictness of the law would charge a man as executor as to creditors, in which a court of equity would not charge him also as to legatees. "Legatees," he said, "were bound by the terms of the will; creditors were not so: and therefore in many cases executors would be discharged as against *legatees*, though not as against *creditors*." 2 *Schoales & Lef.* 239.

An opinion seems to have prevailed at one time, and perhaps, with some at almost all times, that it was an *inflexible* rule to charge executors jointly with all moneys for which they had given joint receipts, upon the ground, that it was unnecessary for them to join in such receipts unless they intended that they should be charged jointly, that is, to be responsible for each other; but that in the case of trustees, the one who actually received the money was alone to be charged, although all had joined in giving the receipt, because it was necessary that all should unite in the execution of the trust where it was joint. Lord ELDON thought this a very *intelligible* rule, but admits that it had been *broken down* by decisions, in which the rule that every case was to be determined upon its own circumstances, was adopted; whether it was wise to do so, he however, thought might be reasonably doubted. 16 *Ves.* 479.

Here we have the admission of an advocate of this first rule, as he seemed to think it was, that its inflexibility no longer exists, but

has yielded to another rule, that every case must be decided upon its own peculiar circumstances. Indeed it may perhaps be somewhat doubtful which of these rules was first established, for *Gibbs* v. *Herring,* in which the latter is adopted and applied, is one of the earliest reported cases that we have on this subject. The former is undoubtedly, as Lord ELDON observes, a very *intelligible* rule, and one too that would probably in most cases be of *easy* application, but the reasonableness of it may be very questionable. I confess that I am unable to persuade myself that the reason assigned for making executors responsible for moneys which they never received, merely because they joined with a co-executor who had received it, in signing a receipt, is in any way sufficient, or that it is true in point of fact. I do not believe that in doing so, they ever think of making themselves answerable for the money where it has been received by their co-executor. On the contrary I believe that it is done, either because they conceive it to be their duty to do so, as in the case of joint trustees, or do it from a desire to satisfy the payer of the money, who may not think he has got a good acquittance or discharge from his obligation unless signed by all the executors. I do not mean to say, that any one who is a lawyer could ever have thought so, but then it must be recollected that every one who has to pay money to executors is not a lawyer, nor is every executor himself one ; and it must also be observed that it is not very easy to discriminate between the office of an executor and the office of an administrator, and yet there was a time when lawyers, and judges too, thought it necessary that co administrators should join in all acts to be done by them in their official character, as in giving a release, &c. because as it was said, administration was in the nature of an *office,* and " if an office were granted to two, they must join in executing the acts of the office." *Hudson* v. *Hudson,* 1 *Atk.* 461. Of this however, the author of the *Touchstone* made a *quere.* *Shep. Touch.* 484-5 ; and since that, the distinction has been repudiated. *Jacomb* v. *Harwood,* 2 *Ves.* 267-8, and *Willard* v. *Fenn,* there cited by the Master of the Rolls. But then, as long as this distinction prevailed between executors and administrators, there was precisely the same reason for applying the same rule to administrators that was always and uniformly held to be applicable to trustees, in giving receipts for money. Since we find then, that at different times different opinions have been entertained, even by those learned in law, as to the necessity of all the personal representatives of a deceased person joining in a release, receipt, or other act, in the course of their administration, would it not be very unreasonable to make executors, who may be quite unlearned in the *quiddities* of the law on this point, responsible for moneys received by a co-executor, merely because they had *unnecessarily* joined with him in giving a receipt for it? It is at most but a mere supererogatory, or perhaps, more properly, *nugatory* act, that can produce no possible injury to any one, and therefore ought not to be made the basis of a claim. The understanding

(Case of M'Nair's appeal.)

and intention of the parties to the transaction, ought to be looked to, and, if innocent, ought to make the law of the case. And when a party requires a receipt to be signed by all the executors or all the administrators, when he has paid the money only to one of them, why should he not have it, if they are willing to give it, without their incurring the risk of paying a penalty for doing so? I repeat again, that I cannot believe that such receipt is ever signed by those who did not participate in the receipt of the money with a view to guaranty either the honesty or solvency of the receiver. They receive no consideration, and have no motive whatever for doing so. And after the money has been so received, what good can it do to those interested in the estate, for the other executors to refuse signing the receipt? None whatever; while, on the other hand, their signing the receipt can work no possible injury to either creditors, legatees or distributees, and certainly puts nothing into the pockets of the non-receiving executors or administrators. Would it not then be most unconscionable to make them accountable for money which they never received, and from which they never derived any benefit whatever; and in respect to which they had done nothing to prejudice the right of any one, or in the slightest degree to hinder or delay his claim? But, if it be said, that it is not on the ground of intention that they are to be made liable by joining in the receipt, but because they have done an *unnecessary* act, one which the law did not require them to do, because the receipt of the one who was the receiver was a sufficient discharge in law, the insufficiency, if not the absurdity, of such a proposition has been already made manifest. It would not only be inequitable and unjust, but repugnant to the whole tenor of the common law, to make a man liable to pay money who had never either expressly or impliedly undertaken to do so; who had violated no law, and done no act that could injure the right of any one or yield the least possible advantage to himself.

From this view of the subject I am induced to believe that there is no good reason for making executors or administrators liable more than trustees for moneys which they have never actually received, merely because they have joined in a receipt with the co-executor or co-administrator who did receive it. The receipt when proved, must always be considered *prima facie* evidence against each of the signers that he received the money; and if he wishes to avoid the consequent liability, it will lie upon him to prove who did receive it, and that it was not received by him.

The distinction which has been taken in some cases, and mentioned in others, for executors being liable to creditors and not to legatees, for losses in the estate, is not without reason, or at least the appearance of it. The creditors of the testator have claims upon his estate, which he cannot defeat or set aside; nor can he give any latitude of discretion whatever to his executors that will prejudice his creditors, in applying his estate to the payment of them. The law lays down the rule here by which the executors respectively are

(Case of M'Nair's appeal.)

to govern themselves. But after his debts are paid out of the estate, the testator can dispose of the residue as he pleases, and prescribe the course that the executors shall pursue in the administration of it. In short his *will*, so far as it can be discovered, may be considered their guide and protection : and hence, as long as the executors shall manage this part of the estate in accordance with the ideas and notions which the testator himself entertained of it, and have done nothing but what there is reason to believe he would have approved, could he have been consulted, it would seem to be unreasonable to make them responsible for losses attending it. This principle has been adopted in several of the cases already referred to, and is directly applicable to the one before us. It is evident that the testator in his lifetime considered the bond of *George* and *John Shelmire* perfectly good; and I think I may say exclusively so, upon the sole responsibility of *John :* for in 1813, three years after this bond had been given, and after it had become payable, there was a meeting of *George's* creditors, about receiving payment of their debts, as it is said, which would seem to indicate the doubtful circumstances of *George* at that time; yet the testator declined receiving the amount of his bond, stating that he did not want it in his lifetime. He was content with receiving the interest upon it, which was paid to him annually until his death in 1816. By his will he, among other things, directed that two of his executors, *John* and *Samuel M'Nair*, two of his sons, should put out to interest for the use of their sister *Rebecca*, twenty-six hundred and sixty-seven dollars of his estate " on land security, or *otherwise render it safe* and *productive*, and pay the proceeds thereof, from time to time (as they in their wisdom should judge most for her benefit,") to her during her natural life. The interest upon the *Shelmire* bond, was paid to the executors for the year 1817, and perhaps 1818. *George S. Shelmire* removed from this state to that of *New York*, in *March*, 1817, in less than a year after the death of the testator, when he was considered insolvent. In *April*, 1818, *John Shelmire*, the other obligor, died, leaving a large estate, but it turned out afterwards upon a suit brought to recover the amount, against his executors, who refused to pay the bond, that it was adjudged to be joint and not several, and therefore the executors of *Samuel M'Nair* were held not entitled to recover upon it against the estate of *John*, as *George* survived him. Among gentlemen of the bar, there was a diversity of opinion whether the bond, taken in connexion with its condition, and judging from the face of the whole, was not several. It does not appear that the testator in his lifetime, or his executors after his decease, ever had the least idea that it was any other than a bond in common form, such as would be binding upon both, or either, and that the death of one could not relieve his estate from the payment of it. Resting secure under this conception of the nature of the bond, the great wealth of *John Shelmire*, one of the obligors, afforded the most perfect assurance of the payment of its amount being

(Case of M'Nair's appeal.)

" *rendered safe* and *productive*" according to the words of the will. Indeed it is not pretended that the bond of any other man in the country could have made it more so.    Is it likely then that the testator, had he continued to live during the life of *John Shelmire*, wanting only the interest on the bond, and receiving that as called for, would have pressed, or even asked for the payment of the principal? He was content to let it rest in this way during his life, considering it perfectly "safe and productive:" and it does not appear that there was any change in the circumstances of the obligors, after the death of the testator, as long as *John Shelmire* continued to live.    It may therefore be reasonably inferred, that had he lived until the death of *John Shelmire*, he would have done as his executors have. Taking therefore the conduct of the testator himself, together with the directions contained in his will, as the rule for the executors to go by, I think it would be too severe to make them answerable for the loss of the amount of the *Shelmire* bond.

The circumstance of one of the legatees having offered to take this bond, which has been so much relied on to make the executors responsible for the loss of it, is perhaps quite as much in their favour as against them.    For if it was offered to be taken as so much cash, as has been suggested, in discharge of the legacy *pro tanto*, it goes to show that such legatee thought it indisputably good, and furnishes strong evidence to sustain the integrity and purity of intention of the executors, and that all were deceived in the opinion which they entertained of the bond, and the nature of it, as to its binding efficacy; and likewise tends to render it probable, that *John*, one of the executors who is said to have objected to parting with the bond in that way, might have thought that it would perhaps answer to form a part of the fund which they, according to the directions of the will, were to establish for the benefit of their sister *Rebecca*, as it was then yielding interest on its amount daily, and seemed to be thought by all concerned in the estate, safely secured.

When it was, that *Craven*, one of the legatees, offered to take the *Shelmire* bond as part of the estate of the testator, does not precisely appear, but it is said to have been about a year after the death of the testator, and certainly before the death of *John Shelmire*. In what way or upon what terms and conditions this bond was offered to be taken, does not distinctly appear.    The conversation about it, seems to have taken place at a meeting of the executors and legatees, held for the purpose of making some arrangements for the distribution of the estate according to the directions of the will; but whether any distribution was then made, or when it was made, is not shown.    It is most likely that no final and positive distribution was then made, for from some of the testimony it would seem probable that the executors interposed an objection at some time, which may have been then, that no refunding bonds were offered.    It does however appear that a bond which was held by the testator at the time of his death and came to the hands of his executors, upon a certain *James Allison*

(Case of M'Nair's apppeal.)

was taken by one of the legatees, but not being able to make it answer his purpose, it was returned, and the legatee finally not charged with it, which shows that this bond though taken, was only taken conditionally. In short, the testimony in respect to all this matter is very vague and unsatisfactory, and in my opinion not sufficient to warrant a decision that there ever was any final distribution and appropriation of the amount of the *Shelmire* bond to the fund of twenty-six hundred and sixty-seven dollars, which was to be set apart for *Rebecca's* use during her life, and I therefore think, that the loss of it ought not to fall upon the trustees of *Rebecca*, nor yet upon *Rebecca* herself, and those who after her death are to succeed to this fund.

And although some of the legatees might have been willing at one time to have taken the *Shelmire* bond as cash, there is no reason to believe that it was because the executors did not require payment of it from the obligors. None of them ever complained of the executors that they were neglecting their duty in this respect. Indeed, it would rather seem that the legatees were not solicitous about collecting the moneys due to the estate if well secured; and that the executors were not willing to give indulgence, in some cases at least, without the consent of the legatees: for all this appears to have been the case with respect to the debt due upon the bond against the estate of *James Allison*, which was outstanding at the time the executors stated their account; and the delay in the collection of it is stated and admitted to have taken place with the assent and approbation of the legatees. When we look at all these things, and take them into our consideration, it is difficult to resist the conviction, that the course pursued by the executors until after the death of *John Shelmire*, created no dissatisfaction with any of the legatees and those concerned in interest in the estate; but on the contrary, was adopted, in part at least, by the former because it met the approbation of the latter.

The executors were not to blame for refusing to take the judgment bond and mortgage proposed to be given by *George S. Shelmire*, for the bond which had been given by himself and his father *John Shelmire*, for it has not been shewn that he had any title for the land that he offered to give a mortgage on; nor that it was of any value: as to his judgment bond, that would have been worthless, unless it were shewn that he had property of some value. But the testimony rather goes to prove that he was insolvent before he left this state, and at the time of leaving it in 1817, and that finally he was compelled to seek relief from the insolvent laws of *New York* state.

Beside, it must be recollected too, that at the time this offer was made by *George*, the executors believed that the estate of *John Shelmire* was liable for the payment of the bond, so that to have acceded to the proposal of *George*, would have been to give up what they considered a good security for the debt, for one that they knew nothing about, which would have been certainly culpable.

(Case of M'Nair's appeal.)

I think it reasonable that the executors should be allowed for the costs and expenses incurred in prosecuting the several suits upon the *Shelmire* bond, for they in truth appear to have acted with good faith through the whole of this business, and it would be wrong, under all the particular circumstances of this case, that they should be made to bear the losses attending it.

The decree of the Circuit Court is affirmed.

Ross, J.—I am clearly of opinion, the executors rendered themselves liable by their gross neglect in not securing the money due from *Shelmire* when it was perfectly within their power to have done so. Their refusal to give the bond to one of the legatees, who was desirous of taking it in payment of her legacy, and insisting on keeping it themselves, was not justified by any circumstance which has appeared in evidence. By such refusal the executors rendered themselves responsible for the payment thereof. No case has been cited which bears the slightest resmblance to the one under consideration. The case of a principal neglecting or refusing to receive his debt, when in his power to do so, and who thereby exonerates the surety, is on principle more analagous to the circumstances of this case, than any which have been adverted to. The ignorance of the executors of the law on the facts, which it was their bounden duty to know and ascertain, and which they might have known by exercising due diligence and prudence, in the performance of their duties as executors, ought not, in my opinion, to avail them. If it will exonerate them, few executors can hereafter be made liable. There are indeed but few among them who are capable of fulfilling the duties entrusted to them, and if men will undertake the management of trusts, which they are intirely incompetent to perform, and afterwards neglect to seek correct information from those who are able to give it, justice, reason, and the soundest principles of equity require, that any loss which thereby ensues, should fall upon those, in consequence of whose neglect or mismanagement, such loss has occurred.

This is very briefly the ground upon which I dissent from the opinion of the majority of the court.

Decree of the Circuit Court affirmed.