## Wilson's Appeal.

1. Where several persons are appointed executors they are generally regarded in law as one person, and, therefore, the acts done by one which relate to the testator's goods, such as sale, delivery and possession, are considered as equivalent to the acts of all, as they possess a joint authority; but, in relation to their several liabilities, they are liable, personally and individually, no further than assets have come into their hands, or where they have done some act which the law considers as equivalent to an admission that the assets were in their hands and power, and were culpably and negligently parted with.

2. An executor, loaning money of the estate upon the personal security of the borrower, does so at his own risk.

3. A. the friend, and B. the son of the testator were appointed by him co-executors. No express trust duties were imposed on them by the will. B. collected $10,000 due the estate for which both A. and B. gave the debtor their receipt. B. gave A. a statement declaring that he alone received the money and was alone accountable for it. He, claiming that he was the natural guardian of his daughters, took this in payment of their legacies under their grandfather's will, which amounted to this sum. A. consulted counsel as to B.'s right to do this and permitted it only upon being informed that it was safe, as B. was financially sound and individually responsible for it. B. became insolvent, when it was discovered that he had misapplied the sum so collected. Upon filing his account, A. was surcharged with the said sum, so collected and misapplied by B. *Held* to be error.

November 15th, 1886. Before GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ. MERCUR, C. J., absent.

APPEAL from the Orphans' Court of *Allegheny county:* Of October Term 1886, No. 241.

Appeal by David M. Wilson from the decree of said court surcharging him on the audit of his account as the surviving executor of the estate of William Noble deceased.

The following facts of the case are taken from the statements of HAWKINS, P. J., filed on the audit of the second account of David M. Wilson, surviving executor of the estate of William Noble deceased, and on the hearing of the exceptions to the adjudication of the audit:

William Noble died in the year 1866. By his last will and testament he gave *inter alia* certain legacies to the daughters, and his residuary estate to the sons of his sons, John and William G. Noble, and appointed his son John Noble and his friend David M. Wilson executors.

William G. Noble died in 1875, leaving six children, four sons and two daughters, of whom four are minors and have guardians. Said John Noble died May 12th, 1884, leaving fifteen children, nine sons and six daughters, of whom eleven are minors and have guardians.

It is conceded that the executors were invested by the will with a trust for testator's granddaughters to be born during the lives of his sons, John and William G. Noble.

The executors assumed the duties of their appointment and filed one joint account, which was confirmed absolutely without exception, in 1872.

The present account was filed by David M. Wilson, surviving executor, and exceptions filed thereto on behalf of certain residuary devisees, who are minors, raise the questions now for consideration.

These questions relate mainly to certain investments made by the executors, and to the appropriation of certain trust funds by John Noble to his own use, the facts of which will be briefly stated.

The objections made to investments were that the values of the real securities taken from Jos. Keeling, Isaac Jackson, John D. Groves and Robert Woods for loans were insufficient, and in the case of Stephen Woods and Frank Plunkett the loans were made on their personal security alone. The real securities were foreclosed, and the executors became the purchasers of the property.

This property has not since been converted, and the surviving executor admits that it cannot now be converted without loss to the estate.

The inventory filed showed personal assets amounting to $127,608.96, and among these was a mortgage of $94,561.50, given by Jones & Laughlin, payable in annual instalments of $10,000 each, beginning January, 1868, and ending January, 1877, with the balance of $4,561.56.

In 1868, the executors filed a joint account in which they charged themselves with the amount of the inventory, and took credit *inter alia* for the amount of the Jones & Laughlin

mortgage.   Jones & Laughlin refused to pay the instalments of their mortgage without the joint receipt of the executors; in this the executors acquiesced; and the instalments were accordingly paid about the dates of their maturity.   The instalments, paid up to and including that in 1874, were deposited, along with the other cash received on account of the inventory, in the joint names, and subject to the joint checks of the executors, in accordance with an arrangement between themselves.   Five thousand ($5,000) dollars of the instalment due in 1875, and five thousand ($5,000) dollars of that due in 1876, not having been charged in the present account, exceptions were filed thereto; and it was shown at the audit that the whole amount of the installments due in these years had been paid respectively on February 19th, 1875, and May 2d, 1876, on the joint receipt of the executors.   In answer to this it was shown, on behalf of accountant, that John Noble had taken and retained the $10,000 which were the subject of these exceptions, under these circumstances.

A daughter having been born to him in December, 1874, John Noble claimed $5,000 out of the instalment of the mortgage, due January 1st, 1885, as being the amount of the legacy to which she was entitled under her grandfather's will.

Mr. Wilson testified:

A. He (John Noble) claimed that he was the child's legal guardian, and Woods, our attorney, he backed him up on it; I was not satisfied; and I went to see Mr. Miller, and paid him for counsel.   He came over (to Woods' office), and they talked the matter over together; and he (Noble) took the money; that is, they talked the matter together, and they asked me whether he was responsible, I told them he was; that he was well known—so he was—and they agreed to give him the money.

Q. And that was the way in which he came to take the money; and you permitted it?

A. I permitted it I suppose; they gave me a receipt relieving me of the money.

Q. He claimed the right to receive that money as the guardian of his eldest daughter?

A. I don't know whether it was the eldest.

Q. One of his daughters who was entitled to a legacy of $5,000 under William Noble's will?

A. Yes, sir.

Thereupon the following paper was given by John Noble to David M. Wilson:

" Mr. David M. Wilson, one of the executors of William Noble, deceased:

" On the 8th day of May, 1875, as executor of William

5 AMERMAN—7

Noble, deceased, I received from, and receipted to Jones &
Laughlin for the sum of five thousand dollars for which I
alone am accountable.                    JOHN NOBLE.
   "*May* 15*th*, 1875."

   In 1875 another daughter was born to John Noble, and he
claimed $5,000 of the instalment of the mortgage due January
1st, 1876, as the amount of her legacy under the will.   He
was allowed to take and retain the amount, and gave to Mr.
Wilson a paper similar to that of the previous year, for the
like reason.

   In fact, John Noble was not the testamentary or statutory
guardian of the estates of either of these daughters at the
time of the receipt by him of these moneys, and never became
such, and Mr. Wilson knew it.   He appropriated the money
to his own use, and never accounted for it.   No guardian of
the estates of these two daughters was appointed until 1884.
Besides the sums retained for his daughters, Mr. Noble had
borrowed from the estate $6,300 and collected $2,270, for
which he never accounted.   In 1880 he ceased to take an
active part in the administration because Mr. Wilson insisted
that he should put the money collected by him in the joint
account.   He died in 1884.

   In 1877 Mr. Wilson became aware that Mr. Noble was
financially embarrassed, and in 1881 that he was using trust
funds, which he had collected, for his own purposes; but
made no effort to secure the estate.

   It appears from an application made to this court for the
sale of the real estate of John Noble, deceased, for the pay-
ment of the debts that the probability is that his estate is in-
solvent.

   If Mr. Noble received the fund as executor, it was his duty
to file an account within a year after its receipt—ten years
elapsed and he died without accounting; and Mr. Wilson not
only took no action to compel account, but does not seem
to have even made inquiry as to the disposition of the fund.
This was negligence, not only by ordinary standards of pru-
dence, but according to his own conduct in reference to other
trust assets.   He insisted that also this money collected should
be placed to the joint account.   Although other daughters
were born to Mr. Noble after 1876, no money was permitted
to be taken even on that account.   There was not only neglect
to account, but knowledge of Mr. Noble's financial embarrass-
ment and perversion of trust assets to his own use, to quicken
watchfulness and correction; and yet seven years after notice of
this embarrassment, and three years after notice of the misap-
propriation until the death of Mr. Noble, were permitted to elapse
without any action having been taken on the part of Mr. Wilson

to secure the trust estate from loss. This surely was supine neg-ligence. It was the duty of Mr. Wilson " to watch over, and, if necessary, to correct the conduct" of Mr. Noble; the neces-sity of correction was manifest and imperative.

The consequences of failure to watch over and correct the conduct of Mr. Noble are seen in his insolvency and this liti-gation.

It must be assumed that the depreciation of Mr. Noble's real estate was gradual. If it was, there is no room to doubt that prompt action by Mr. Wilson would have made the trust estate secure.

The distinction which was recognized in Verner's Estate, 6 W., 250, between the rights of creditors and legatees, as against joint executors is not now regarded with favor: Weldy's Appeal, 102 Pa. St., 454; and has no application in cases of negligence: Id.

The liability of Mr. Wilson, for the "loss resulting from his failure to watch over" and "correct the conduct" of his co-executor follows as a necessary consequence.

A decree was accordingly entered surcharging David M. Wilson the accountant with the amounts collected by Noble from Jones & Laughlin with interest thereon and the amount of the losses on the loans above mentioned. David M. Wilson thereupon took this appeal, and filed the following assignments of error. The entire decree constituted the first assignment of error.

2. The court erred in decreeing a surcharge against ac-countant for the two sums of $5,000 each, received by John Noble in 1875 and 1876 on the mortgage from Jones & Laughlin, and interest thereon from the date of John Noble's receipt of the same.

3. The court erred in striking out credit for, and surcharg-ing accountant with, the amounts of $770 and $184 interest thereon, and $1,500 and $142.50 interest thereon, being the amount of two notes dated respectively September 15th, 1881, and February 23d, 1884, being the two notes which the court below found were given to the accountant by his co-executor, John Noble, for moneys collected and used by him without the knowledge or fault of accountant, the total amount of said surcharge being $2,596.50.

4. The court erred in striking out the credit of $900, known as the Frank Plunkett claim, and in surcharging accountant for the same, with interest from November, 1879.

*D. T. Watson & Hays,* (*Noble* with him) for appellant.— Where one executor had received money belonging to the estate of the testator, and paid it over to his co-executor, who

became insolvent; it was held, that though he would be chargeable, if there were creditors, and a deficiency of assets to satisfy them, yet that he was not answerable to the legatees: Brown's Appeal, 1 Dallas, 311; Verner's Estate, 6 Watts, 253.

All that is required from trustees is common skill, prudence and caution, and when they act as others do with their own goods and with good faith, and are not guilty of gross negligence they are not personally liable for any loss, especially if they have acted under the advice of counsel: Spering's Appeal, 77 Pa. St., 11; Calhoun's Estate, 6 Watts, 185; Christ *v.* Brindle, 2 Rawle, 121; Neff's Appeal, 7 P. F. S., 91; King *v.* Morrison, 1 P. & W., 188; Eyster's Appeal, 4 Norris, 372.

Common skill, common prudence and common caution are all that courts require from trustees: Konigmacher *v.* Kimmell, P. & W., 207, A. D., 1829.

Where executors act in good faith and under the advice of eminent counsel, they are not responsible for an error of judgment: Spering's Appeal, *supra;* McNair's Appeal, 4 Rawle, 148; Eyster's Appeal, *supra;* Calhoun's Estate, *supra;* Christ *v.* Brindle, *supra;* Neff's Appeal, *supra;* King *v.* Morrison, *supra;* Newkirk's Appeal, 3 Grant, 323.

Lord ALVANLEY, in Scurfield *v.* Howes, observed that he dissented from the rule that if one executor receives the money and two sign the receipt both are chargeable if it appear that the second joined for conformity only : Williams on Executors, p. 1936.

Lord REDESDALE, in Joy *v.* Campbell, took the distinction to be that, if a receipt be given for the mere purposes of form, then the signing will not charge the person not receiving: Brown *v.* Lytton, 1 P. Wms., 141.

There is a distinction between the liabilities of executors with respect to creditors, and those with respect to legatees, and there are many cases in which they would be discharged as against the latter, though not against the former.

Perhaps the best statement of the rule, in respect to executors, that is to be found in our books, is that by Judge COULTER, in Hall *v.* Boyd, 6 Barr, 270.

*George W. Guthrie, (Kennedy T. Friend* and *C. W. Robb* with him,) for appellees.—In Ducommun's Appeal, 5 Harris, 268, it appeared that two executors filed a joint account showing a balance in their hands of several thousand dollars ; this balance they divided equally between themselves, being required to retain it to pay certain legacies.

This court held that executors could not relieve themselves from the liability created by their joint account by thus divid-

ing the assets between them. "By the settlement and confirmation of a joint account, showing a balance in their hands, the joint liability of the executors is admitted and adjudged. The fact that they divided this balance equally between them does not alter their liability; for this was their own act, and they, and not the legatees, must bear the consequences of it. Only he who confides should suffer by a breach of trust. The legatees confided in the joint liability of the executors, and we cannot transfer their confidence to a single one. Each executor, confided in the other, and if that confidence was misplaced, he that misplaced it must suffer for it. These principles are plain; and we are not called upon to reconcile the somewhat inconsistent cases of Brown's Appeal, 1 Dallas, 511; McNair's Appeal, 4 Rawle, 154; and Sterrett's Appeal, 2 Penn. Rep., 419." (See opinion by LOWRIE, J.)

The same rule was applied in Hengst's Appeal, 12 Harris, 413. On the authority of Weldy's Appeal, 6 Out., 454, the decree in this case was rightly entered.

Mr. Justice CLARK delivered the opinion of the court, February 7th, 1887.

It is a general rule that a *devastavit* by one of the executors will not charge his co-executor, unless the latter has in some way contributed to it, for the testator's misplaced confidence in one, should not operate to the prejudice of the other. Administrators, by giving bond, become sureties for each other: (Boyd *v.* Boyd, 1 W., 367), but executors, excepting under special circumstances, are liable only for the amount which comes into their hands, respectively: Stell's Appeal, 10 Barr, 152.

In Hall *v.* Boyd, 6 Barr, 270, the rule is thus stated:— "When several persons are appointed executors, they are generally regarded in law as one person: Bacon's Abr. tit. Exec. D. 1; and, therefore, the acts done by one which relate to the testator's goods, such as sale, delivery, possession, etc., are considered as equivalent to the acts of all, as they possess a joint authority. But in relation to their several responsibilities, the rule is different; they are liable, personally and individually, no further than assets have come into their hands, or where they have done some act which the law considers as equivalent to an admission that the assets were in their hands and power, and were culpably and negligently parted with."

In Irwin's Appeal, 11 Casey, 296, the foregoing is said to be the best statement of the rule to be found in our books. Whilst the cases, not only in this state, but elsewhere, considered with reference to the particular facts upon which they

arise, are certainly conflicting, we think the language employed by the court in Hall *v.* Boyd, above quoted, regarded as a general statement of the law, may be taken as the result of all the cases in this court, and as the correct rule of an executor's responsibility for the act or default of his co-executor, in this state.

Therefore, in Duncommun's Appeal, 5 Harris, 270, where there was a joint account settled and confirmed, both of the executors were held to have admitted themselves of record to be liable for the whole balance in their hands, as shown by the account. The confirmation of a joint account discharges a previous separate liability, and establishes an admission and adjudication of a joint one: Haage's Appeal, 5 Harris, 190; Hengst's Appeal, 12 Harris, 413.

So in Wiegand's Appeal, 4 Casey, 471, a testator bequeathed to a daughter the interest accruing on a bond by one of the executors, annually during her life, and directed the principal *to be secured* by his executors. No steps were taken to secure the principal, and the obligor became insolvent and died; it was held, that the securing of the interest and principal was, under the will, a joint duty of the executors, and that the surviving executor was therefore liable to the legatees. To the same effect is Weldy's Appeal, 6 Outerbridge, 454, where the executors disregarded the plain directions of the will, to invest the fund committed to their charge, and divided the funds between themselves, without any security on part of either; it was held, there was such a neglect of a joint duty expressly enjoined by the will, as rendered them liable, the one for the other, for any loss or misapplication of the fund, or any part of it.

Upon the same ground in Pim *v.* Downing, **11 S. & R.**, 71, it was held, that when a co-trustee, who does not receive the money, consents that the other should misapply it, particularly when he has it in his power to secure it, he is responsible.

In the case now under consideration no express trust duties are enjoined upon the executors by the will; the trust arises by implication only, and the duties of the executors are such as are incident to their office. The $10,000 received by Noble on the Jones & Laughlin mortgage was never in the hands of Wilson. Noble was at the time he received the money in fair credit, his financial standing was good. He was the owner in fee of eighty acres of land which, it is said, was assessed for taxes at the rate of $500 per acre, but which one of the witnesses, at least, says, and he is not contradicted, was worth $1,400 per acre. When the first $5,000 was received, the land was incumbered to the amount of about $7,000, only; when the second $5,000 was paid he had entered against him,

in addition to the amount already stated, the official recognizance of R. H. Fite, Esq., High Sheriff of Allegheny county, in the sum of $25,000, upon which he was one of the sureties, but it does not appear, that he was held for payment, or was ever required to pay any part, of the amount secured by it.

Noble and Wilson were co-executors; they were equal in authority; the will gave no power, or imposed no duty upon one, which was not common to both. They were jointly held for the balance exhibited in their first account, but either of them might receive the money from Jones & Laughlin which was not embraced in that account, without charging the other; they were not liable for the uncollected securities, for which credit was taken in the account: Lightcap's Appeal, 95 Pa. St., 456. Noble, it is admitted, did receive this $10,000 and the sole question is, did Wilson do anything, or omit to do anything, in the transaction, which would make him liable for the loss of it?

Jones & Laughlin, it appears, refused to pay the money except upon the receipt of both of the executors, and although the testimony does not seem to establish the fact, the learned judge of the Orphans' Court states, that the receipts were signed by both. But this circumstance, alone, would not be sufficient to create a joint responsibility of the executors. "At one time," says Mr. Justice BELL, in Stell's Appeal, 10 Barr, 152, "it seems to have been received as an inflexible rule that where executors joined in a receipt they were jointly chargeable, on the ground that a joinder was unnecessary, unless they intended to be responsible for each other. But this rule has never extended to trustees, created by deed, since it was necessary all should join in the execution of the trust, and consequently were compellable to execute joint receipts, though one of them only received the fund. And even in the case of executors, modern good sense, looking beyond the technical reason of the rule, which was supposed to be applicable to the peculiarity of the trust devolved on them, seems to have broken down the distinction between them, and other trustees, by denying that in reason, an intent to be jointly chargeable is deducible from the mere fact of joining in a receipt: per Lord Eldon, 16 Ves., 479; McNain's Appl., 4 R., 148; Brown's Appl., 1 Dall., 311; Sterrett's Appl., 2 Penn. Rep., 420–1; Vernon v. Henry, 6 W., 192."

It is said, however, that Wilson consented to a misapplication of the money. If John Noble retained the money under the claim that he was the natural guardian of his daughters, who were yet in their minority, and applied it to his own use, this was, without doubt, a perversion of the money to an improper purpose, a plain misapplication of the trust moneys;

but, after an examination of all the evidence, we are unable to agree with the learned judge of the Orphans' Court, that Wilson ought to be held for the result. If the testimony of Wilson is believed, and he is not contradicted or in any way discredited, he made a vigorous resistance to Noble's retention of the money for this purpose. He consulted Robert Woods, Esq., a highly respected member of the Pittsburgh bar, who was their counsel in the settlement of the estate, and Mr. Woods "backed" Noble's pretensions to the money. Mr. Wilson says:—" He (Noble) claimed that he was the child's legal guardian, and Woods, our attorney, he backed him up on it; I was not satisfied, and I went to see Mr. Miller (Jacob H. Miller, also a member of the bar) and paid him for counsel ; he came over, and they talked the matter over together, and they asked me whether he was responsible; I told them that he was, that he was well known to be (and so he was), and they agreed to give him the money." This was on the 15th May, 1875, some seven days after the first $5,000 was paid. After the consultation, Mr. Woods wrote, and Noble signed, a paper in the following form :

Mr. David M. Wilson, one of the executors of William Noble, deceased, on the 8th day of May, A. D. 1875, as executor of William Noble, deceased, I received from and receipted to Jones & Laughlin for the sum of five thousand dollars, for which I am alone accountable.

*May* 15*th*, 1875.         (Signed)     JOHN NOBLE.

A similar paper was given on receipt of the second $5,000. Denying the right of Noble to retain the money, or to apply it to the purpose stated, what could Wilson do more than to place the whole responsibility of the transaction on Noble? The latter had a right to receive the money, Wilson could not gainsay his right, and, having received it, he might either deposit it to the joint account, or otherwise, as he chose. He was not bound to submit himself to the consequences of a joint control, and, therefore, to a joint responsibility, against his will; he was in good financial credit, and had a right to the custody of the fund on his own responsibility; and this was precisely the right which Wilson permitted him to exercise. Wilson did not consent to the proposed misapplication of the money; to that he objected, and applied to counsel for relief against it; but, being advised that if Noble was responsible, he had an undoubted right to take the money on his own responsibility, he suffered him to do so, taking a receipt to show the measure of his individual liability to the estate. *Non constat* that Noble would use the money as his own, or otherwise misapply it; it was his duty to invest it to answer the call of those entitled when their right accrued, and certainly Wilson was

not called upon to guard the interests of the estate until its rights were invaded.

It is contended, further, that Wilson should be charged with this portion of Noble's defalcation, because he made no effort to secure the estate against it. It is doubtless the duty of all executors to watch over and, if necessary, as far as practicable, to correct the conduct of each other; an executor or trustee who stands by and sees a breach of trust committed by his co-executor, without any effort on his part to prevent it by the use of such remedies as the law may afford, becomes responsible for that breach of trust. In 1877, it is said, Wilson became aware that Noble was financially embarrassed and, in 1881, that he was using the trust funds, which he had collected, for his own purposes. Whether this embarrassment was supposed to be of a temporary nature, or of such a pronounced character as to seriously affect his credit or to threaten insolvency; or whether his use of the trust funds was beyond the amount for which he then took Noble's note, does not appear. The testimony on these points is certainly very meager and unsatisfactory. The sheriff's recognizance appears to have been entered for the purpose of lien only as directed by law; it is not shown that Noble at any time was obliged to pay any part of the money secured by it. The other liens were small in proportion to the estimated value of the property, and it does not appear that Wilson knew, or had any reason to suspect, that he was otherwise largely indebted. Wilson, we think, acted in this matter in entire good faith; he stopped the further receipt of the trust money by Noble; from the year 1880, when he received the first information, he refused to permit Noble to make any further collections; they agreed upon a receiver, and thereafter the collections passed into a receiver's hands, and Wilson now stands charged with all the moneys which he received. He took Noble's notes for the amount he had used of the trust estate, and with these notes he has been surcharged. Under these circumstances we hesitate to say that it was gross negligence in Wilson not to proceed without delay against Noble for an account, for his removal from office, and for a surrender of the trust estate in his hands, such a proceeding he would certainly not be required to institute against his co-executor, if he were required to do so at all, unless he knew, or had the means of knowing, and therefore ought to have known, that he was wasting and mismanaging the estate under his charge, beyond the amount for which he had already accounted to Wilson in the notes referred to, or that he was likely to prove insolvent, and of his knowledge, or means of knowledge, in this respect the evidence is, we think, slight indeed. Upon the first and second assign-

[Tasker *v.* Sheldon.]

ments of error, therefore, the decree of the Orphans' Court must be reversed.

The third and fourth assignments of error are not sustained. Having taken the notes referred to in the second assignment, it was Wilson's duty under the circumstances to secure them by lien or otherwise, as any other loan or investment; not having done so, he must be held for payment thereof. The Plunkett loan was upon the personal security of the debtor alone, and the subsequent advance of funds in relief of the original loan was, under the facts shown, at the risk of the accountant.

> The decree of the Orphans' Court is reversed, and the record is ordered to be remitted, that distribution may be made in accordance with this opinion.