8ws143
134   85

8ws143
159  521

8 WS 143
d214      453

8ws   143
f221    ² 81

EASTERN DISTRICT—DECEMBER TERM 1844.

## Jones's Appeal.

It is not universally or even generally true that money which has come to the hands of a trustee by the act or consent of his colleague, without positive negligence on the part of the latter, is chargeable indifferently to either.

The diligence required of a trustee in the care of the trust estate is precisely the diligence which a man of ordinary prudence would practise in the care of his own.

*Held*, therefore, that where joint guardians in affluent circumstances and in good repute apportion the custody and management of the property to suit the peculiar capacity and qualifications of each, but without surrendering the right of either to intermeddle with the whole, each is chargeable with no more than he received, unless he stood supinely by while his colleague was manifestly impairing the estate.

THIS was an appeal by Paul Jones, one of the guardians of the three minor children of John H. Levering, deceased. In March 1826 Paul Jones and John Levering were appointed guardians. Paul Jones was cited in the Orphans' Court of Philadelphia county to settle his account. He filed an account stating the sum of $78.92 principal and interest of money received by him of Abraham Levering, the administrator of John H. Levering, deceased, on the 22d January 1838, accompanied with an answer on affirmation stating that " the principal management of the concerns of

(143)

said children was conducted by John Levering. That your respondent herewith files an account of his guardianship, showing the only transactions which he has had as guardian. That the said account is just and true in the charge and discharge thereof, to the best of his knowledge and belief, and that no other money, property or estate belonging to his wards, other than that stated in his said account, ever came into his hands, possession or power; and that he has no other account or settlement of his guardianship to make; whereupon he requests he may be discharged from the further answer to said citation."

No objection was made by the complainants to the items of this account, but they sought to charge him with moneys received by his co-guardian, amounting, according to the auditor's report, to upwards of $900, and lost in consequence of his insolvency. The auditor, on the authority of *Bone* v. *Cook*, (*M'Clelland* 168); *Oliver* v. *Court*, (8 *Price* 127); *Brice* v. *Stokes*, (11 *Vez.* 319), and *Walker* v. *Symonds*, (3 *Swans.* 61), thought that the appellant was chargeable with the whole; and his report was confirmed by the court below.

The following was the evidence given in the case as reported by the auditor.

Paul Jones affirmed.—Abraham Levering gave me notice. It (the guardianship) was offered me, and I agreed to assist John in taking care of the property, with a clear understanding with Abraham that I shouldn't have anything to do with the money; these were the conditions on which I agreed to accept it. Never was asked for security. Was a neighbour of John Levering's; lived in sight of him. I received what money I have returned here. I took the money I have returned because Abraham pressed me to take it. I was unwilling because I had declared off in the first start. Abraham gave me a reason; the reason he gave was a wish of the family, and his wish; and that they couldn't get the money from John Levering's hands.

Abraham Levering affirmed.—I think in two days after his appointment I informed Paul Jones of it. All the children were small. Jonathan was the oldest, and was then about eleven. There was no contract made by me with Mr Jones before the appointment; he agreed to serve with John Levering. Soon after the appointment he wished me to pay the money to John; he thought him most competent to do the business; it was at his suggestion I paid it to John. I never made any agreement with Jones that he was not to be liable in his trust as guardian. Mr John Levering has failed, and made an assignment. I should have paid the money to either, as most convenient to myself, but for Mr Jones's suggestion. We thought them both responsible.

Cross-examined.—I don't recollect, when I asked him to be guardian, that he objected to have the money. I know that he at first refused. I do not recollect that he refused to have anything

to do with the money affairs; when the money was paid to him, he refused to receive it, as John had received the rest, and I told him the family wished him to receive it.

Levering recalled.—There are about $19,000 of incumbrances on my estate—one mortgage $11,000, date something like 1833 or 1834—the others are judgments obtained within the last two or three years.

Jones recalled.—I valued the estate of Levering within the last year, and valued it at $26,000. We thought four years ago it was worth more.

Margaret Levering affirmed on part of exceptants.—Six or seven years ago Paul Jones was at my house, before my son Jonathan was of age; he is now twenty-seven. Jones said he didn't know what to think of John Levering, some one or other would always be calling him of one side; that he expected they were after money. Jones said he would receive money from Abraham Levering; that he was sorry he hadn't received more of it. Jones acted as guardian.

Isaac W. Roberts affirmed on part of P. Jones.—I have known John Levering and Paul Jones since we were boys. I shall be fifty-three next spring. I considered John Levering one of the wealthiest men we had in our neighbourhood, till twelve or fourteen years ago; he then met with a considerable loss that deranged his business. I had then no doubt about his solvency. Up to the time he made his assignment, and some months after, I thought he would have more than enough to pay. On the 18th May last (1841), his assignment was made. I loaned him money less than a year before his assignment, $50. I should have made no difficulty in paying him money as guardian. Until Levering met with this loss, I should have thought him richer than Jones.

Cross-examined.—I have no hopes that his estate will pay his debts. If it had been sold a year ago, I think it would.

Joseph Trasel affirmed.—Known Levering a number of years; always considered him in good circumstances until the time referred to by Mr Roberts; at that time he sustained a loss; but always thought him a solvent man up to the time he made his assignment. I knew or heard that he was pushed for money a few months or a year before his assignment.

George F. Culin affirmed.—I have heard of John Levering many years ago. The first I heard of his pecuniary difficulties was in reference to taxes. He was always esteemed and spoken of as a solvent man. Two or three years ago Reverend Mr Jones told me he was pushed.

Peter C. Erben sworn.—I have known John Levering only six or seven years intimately; always thought his property sufficient to pay his debts.

John Levering affirmed on behalf of Jones.—I was born in Lower Merion township, Montgomery county, opposite Manayunk. I

have lived there all my life. I inherited real estate there from my father. I was a miller—had a saw-mill, a grist-mill—and afterwards was a woollen manufacturer. I have been on several occasions administrator, executor, guardian, trustee. Two or three years before I made my assignment, I was appointed a guardian. That appointment, I think, was in 1838 or 1839. The heavy loss that I sustained, that is mentioned in the auditor's report, happened in 1831, in consequence of the failure of Gillingham, Mitchell & Co. They failed in the latter part of that year. They were my factors. In the early part of the same year I sustained a heavy loss by a freshet. I could not see that my general character and standing were affected by these losses. I don't think that I could see any material difference until within two or three years of my assignment. I borrowed a sum of money in April 1839 of Mr Grant, on bond and warrant of attorney. It has not been entered in the office. After I sustained my heavy losses I was able to meet my engagements with punctuality, and to borrow money for my current purposes. I could do so as well as most men in business at that time, I believe. My final failure took place in May 1841. So far as I could judge, that failure was unexpected by others. It was after 1833, I can't tell the year or day, Paul Jones asked me if the funds of the children of John H. Levering were invested. I told him they were out on bond and mortgage. A part in fact were out on bond and mortgage; the part that was out was the same $700 that was handed over to my successor in the guardianship. The rest of the money was not in fact invested; it was in my own hands. I don't know that I let Mr Jones know that fact.

Question for Paul Jones.— As far as you know or believe, did anything occur to induce Mr Jones to believe that any part of the money was uninvested? *Objected to. Witness answers.*— No; he appeared to be satisfied with what I told him. I can't remember the precise words of Mr Jones; he generally made inquiries if the moneys were out at interest. My answer was a general one. I can't say how many times this occurred, but two I have a distinct recollection of. I think the last one was within two years of my assignment; the first was after 1833, I can't tell how long. On each occasion Mr Jones appeared to be satisfied.

Cross-examined.— I think I did not show Mr Jones any bonds or mortgages on the occasion referred to. I did not show him any; he did not ask to see them. I do not recollect that he asked me the name or names of the borrowers, but I think I told him the name, Young; there was no other name. I can't say whether I told him the amount Young had. I think he did not ask me the amount. I think I told him on what real estate the money was loaned. I don't know that I was so particular as to tell him the county. He knew the place as well as I did; that it was in Manayunk. I don't know that he personally knew Young. I never

[Jones's Appeal.]

exhibited to him the state of my accounts, the balance in my hands. He never, to my recollection, asked me. I never told him the amount of money in my hands. He never asked me. I can't say positively that I did or not tell him the amount invested. I can't say whether he asked me. I don't know that I ever exhibited to him any papers connected with my trust. To my recollection he never asked me. At the time of my failure I owed; the whole gross amount was $24 or $25,000. I can't say what amount was on bond and mortgage, without taking some time to add them together. I can't tell what amount on notes or other contracts, unless I had a list to separate them. I can't tell whether my estate will pay this trust fund. I thought my estate would pay all. The present prospect is not flattering. From present appearances, my estate will not pay this trust fund. My failure was not expected by me one day before my failure. I did not pay all demands on me promptly up to my failure. I did till pretty nearly the time. Till about a year before. Since the failure of Gillingham, Mitchell & Company, I have met with losses; none heavy, but all taken together were heavy.

Re-examined. — In 1834, when Abraham Levering paid me $100, it was paid as other moneys had been. Nothing passed between us, except that the money was just paid and received. I think my answers to Mr Jones' questions were in a kind of a general way, that the moneys were invested in bond and mortgage.

*Cadwalader*, for the apellant, referred to 13 *Price* 332; 6 *Watts* 189; 11 *Vez.* 327; 1 *P. Wms.* 244.

*Hirst*, contra, cited 2 *P. R.* 420; 1 *Watts* 367; 2 *Ashm.* 470.

The opinion of the Court was delivered by

Gibson, C. J.— Parents, guardians, executors, receivers, and all who manage the estates of infants, are responsible as trustees, and held to the same diligence; but for participation in the acts of their colleagues, the liability of executors is peculiar. In *Sadler* v. *Hobbs*, (2 *Bro. Ch. R.* 117), Lord Thurlow admitted the rule to have been confirmed in *Leigh* v. *Barry*, (3 *Atk.* 584), that an executor, joining with his colleague in the signature of a receipt or conveyance, makes it his own; and he questioned the soundness of *Westley* v. *Clarke*, (1 *P. Wms.* 83), in which Lord Northington had held a different opinion; but the master of the rolls subsequently professed, in *Scurfield* v. *Howes*, (3 *Bro. Ch. R.* 94), to find no fault with it. The distinction between executors and trustees, in this respect, is important; for it might be shown that the instances in which a mere trustee has been charged with the defaults of his colleague are comparatively rare. In the *Treatise of Equity*, (*Fonb., B.* 2, *Ch.* 7, § 5), as well as in the opinion of the Lord Keeper, in *Fellowes* v. *Mitchell*, (1 *P. Wms.* 83), the charging

of an executor for having signed his colleague s receipt is put on the foot of necessity, and likened to confusion of goods, though it is obvious that the same uncertainty in ascertaining how much had been received by each is produced by the joint receipt of trustees. The true reason seems to be, that it is unnecessary for executors to join; and that where they gratuitously assume the character of joint receivers, they agree to trust each other, and become joint accountants, while no such conclusion is to be drawn from the receipt of trustees who cannot choose but join.

In this instance, the question touches the liability of trustees for each other's receipts, without joinder. The appellant was charged with his colleague's defaults on the principle (*Fonb*. 185), that where money gets into the hands of a trustee by any *act* or *agreement* of his colleague, both are chargeable with it; and that if they agree that each shall have the management of a particular part of the estate, each shall be chargeable with the whole. There is certainly a *dictum* to that effect of Lord THURLOW, in *Sadler* v. *Hobbs ;* but *Gill* v. *The Attorney-General*, (*Hardr*. 314) on which he relied, does not bear him out. That was the case of commissioners severally bound with sureties to perform all the articles and rules of the excise; and they were held not to be answerable for each other. That was the point decided; and it turned on the interpretation of the bond. But it was said in illustration, that though an executor is chargeable for no more than comes to his hands, yet if executors agree among themselves that "one be to receive and meddle with such a part of the estate, and another with such a part, each of them will be chargeable with the whole, because the receipts of each are pursuant to the agreement made betwixt both." This is the only thing even in the shape of a *dictum* that amounts to a judicial recognition of the principle; and it was not predicated of trustees, but of executors, who have separate power to intermeddle and receive without any agreement whatever. *Scurfield* v. *Howes* was also the case of executors who had joined in a receipt; and *Westley* v. *Clarke* impugned the doctrine, as we have seen, even as to them. But in *Fellowes* v. *Mitchell*, Lord COWPER, speaking of the responsibilities of trustees, said: "it seems to be substantial injustice to decree a man to answer for money which he did not receive, at the same time that the charge on him by joining in receipts, is but *notional*." Other cases are much stronger against the principle, as Mr Fonblanque has asserted it. In *The Attorney-General* v. *Randall*, (21 *Vin*., *Trust, N, a, pl*. 9), one of three trustees to build an almshouse, called on the executors of the founder for the money; and payment being refused, except on the joint receipt of all, he procured the signature of the others, received the money, and failed at the end of four years. The Lord Chancellor said, "it could not be expected that all should meet together to receive; but if they had, either one must have had the custody of the whole, or it must have

been divided into shares. And if they *entrust one of themselves for convenience or necessity, when all are solvent,* which is no more than making him their banker, shall equity punish where there is no default? And this is the case of *Churchill* v. *Hopson;* and to charge trustees in such a case would make the case of trustees very perilous, which are very necessary for the common good and convenience of families. And he said that he saw no reason why trustees may not make one of themselves their cashier when there is no fraud; that this was *a reasonable* thing at the time, as R. (the receiver), was the only trustee who lived in London where the money was paid: and as to an objection made to letting the money be so long in R.'s hands, he said the case of R. differs from the case of a common banker, where the money may be drawn out at pleasure; but here R. had as good a right to the keeping it as the others; and all paid out till about one-third; and he was entrusted by the testator as well as the others." Now the joint receipt was signed, in that case, for the very purpose of enabling R. to get the money; and it consequently " got into his hands by act and agreement" of his colleagues, of a nature as absolute as an order would have been. Every joint receipt is such; and less negative in its essence than a refusal to receive. I have extracted the opinion of the Chancellor entire, not only because it embodies the good sense of all that has been said on the subject, but because every part of it may be applied to some feature of the case before us; and I shall add no more than that *Townley* v. *Chalenor,* (*Cro. Car.* 312); *Murrell* v. *Pitt,* (2 *Vern.* 570); *Leigh* v. *Barry,* (3 *Atk.* 584); *Churchill* v. *Hobson,* (1 *P. Wms.* 241); and *Applyn* v. *Brewer,* (*Prec. in Chan.* 173), powerfully support it. In declining to receive the money of the estate, the appellant did no more than every trustee does who signs a joint receipt for the purpose of putting it into the hands of his colleague; and in limiting his active agency to that part of the business for which alone he was qualified, he acted with extraordinary zeal and discretion. Who will say that the arrangement did not promise fairer for the wards than any other that could have been adopted? and if it was executed in good faith, why should it be made a ground of charge? The appellant was peculiarly fitted by experience for the management of real estate, but not conversant with pecuniary transactions; while his colleague, on the other hand, had experience in the business of investment and in accounts, having often been an executor, an administrator, or a trustee. Guardians are sometimes chosen for diversity of qualification, so that each may take charge of those parts of the trust for which his pursuits have fitted him. A lawyer might beneficially leave the management of his ward's furnace or forge to a colleague bred an iron master, while he himself attended to matters more congenial to his profession. Still it must be admitted that a guardian commits a breach of trust when he parts irrevo-

N *

cably, even for a time, with his *right* of joint control, so as to preclude him from exercising it when necessary; as in *Keble* v. *Thompson*, (3 *Bro. Ch. R.* 111), where the one trustee lent the funds to the other. The appellant, therefore, is not chargeable merely for having declined to meddle with the moneys in the first instance; and the next inquiry is, whether he ought to have interposed before he began to doubt his colleague's solidity; or whether he ought to have been satisfied with the explanation given when he called on him for information about the state of the property.

The result will depend very much on what is the proper degree of a trustee's vigilance. In *Pybus* v. *Smith*, (1 *Ves. Jun.* 193); *Palmer* v. *Jones*, (1 *Vern.* 144); *Man* v. *Ballet*, (*Ibid.* 44); and *Harnard* v. *Webster*, (*Select Ca. in Ch.* 53), it is said that he is to be charged only for his own receipts, or for supine negligence, and when the proof of it is strong. Sir WILLIAM JONES (*Law of Bailm.* 22) says that no more is required of the holder of another's property, under a contract beneficial only to the owner, than good faith; that he is answerable for gross negligence only; but that in regard to a commission or mandate by which an affair is committed to another to be managed gratis (and a guardianship is such), good faith itself requires that he use a degree of diligence adequate to the performance of the work. And this degree, it seems, was required, by the Roman law, to be greater than perhaps he might think proper to bestow on his own affairs, (*Ibid. note* 5); not, however, I presume, if he were a man of ordinary prudence. By this I mean that one who undertakes the business of another as an unpaid agent, engages to exercise in it the degree of vigilance that a man of ordinary diligence and skill would exercise in his own. Now, though guardians receive a sort of compensation from the liberality of the court, they are of right entitled to nothing; and they stand with us in the same degree of responsibility as they do in England, where their services are gratuitous. But a guardian is allowed, at all, only for services, not for risks; and as the law has no higher aim than to place the property of an infant on the same footing of security as the property of an adult, the appellant was bound to deal with the estate of his wards only as it may be supposed they themselves would have done, had they been of age.

But, in addition to the charge of having refused to become a receiver, he is accused of negligence in regard to the receipts and investments of his colleague. His appointment seems to have been procured by the administrator, and probably the family, with a view to his services in managing the real estate, for which he was peculiarly qualified. There is no positive proof of the fact, but it may be inferred from the circumstances, that the appellant was appointed without his knowledge, and that his acceptance was procured by the administrator, himself one of the family, on an express understanding that the business of the guardianship

should be apportioned. Under the civil law, the family council was a legal institution, whose influence in domestic concerns was decisive; and family arrangements are still so far regarded by courts of equity as to be ground for sustaining agreements between parent and child, or between brothers, which would else fail for want of consideration. I pretend not that a stipulation of the administrator, with the assent of the family, would bind the minor children; but it is not too much to say, that the family approbation of the appellant's course may legitimately weigh in a question of negligence. But, without aid from that quarter, it seems, from the nature of the case, that. he acted with extreme caution and singular discretion in leaving the management of the moneys to one who was better qualified for it, and whose wealth afforded greater security against loss from insolvency.

Negligence is still further imputed to him, for omitting to call his colleague to account, when fears of his insolvency were actually excited in him. But the ground of these fears was very slight, and less might therefore justify him in dismissing them. Both then and afterwards no one stood higher in public opinion than his colleague, as a man of integrity, business, and wealth; and that the appellant had no stronger reason to suspect him than having sometimes seen him called aside on private affairs by those who may have been duns, argues a very great degree of vigilant observation. By these trifles, however, his suspicions were aroused, and they impelled him to do what a cautious man might be expected to do. He inquired into the disposition made of the money, and was told by his colleague, whose truth had never been doubted, that the whole was invested in bonds, secured by a mortgage on a landed estate, which was pointed out. To require him to have dealt with his colleague as a rogue, by calling for the securities, would require of him the highest and most exact vigilance; a degree of it that would ruin every guardian. No rate of commission would compensate the risk incurred from such a trust, and no man of prudence would accept it. Responsible guardians would not be had, and infants would be injured instead of benefiting by it.

It is urged that the appellant was bound to call his colleague to account as soon as he was so far satisfied of the insecurity of the funds in his hands as to consent himself to become the receiver. These guardians were appointed in 1826; the prosperity of him who has since become insolvent received its death-wound in 1831; the catastrophe was not expected by any one but himself before 1838—two years before his assignment—insomuch that he borrowed money in 1839, on bond and warrant, which has not been entered up; and he borrowed another sum, on his personal security, in 1841, a short time before his failure. It is true that the appellant consented, in 1838, to receive the residue of the money, at the administrator's suggestion, for which no reason

was assigned; and there was consequently little in the suggestion to shake his confidence in his colleague's stability. It is true, also, that the mother testified to the appellant's admission, made six or seven years before 1841, that he did not know what to think of his colleague, and that he would himself consent to become the receiver; but her testimony is unworthy of confidence, inasmuch as it goes back to a period decisively anterior to 1838, the time material to the question.

Again, it is insisted, on the authority of *Brice* v. *Stokes*, (11 *Vez.* 319), and *Walker* v. *Symonds*, that laches was chargeable to the appellant in suffering the money to lie in his colleague's hands for fourteen years; especially as the statute of 1821, since repealed, made it the duty of guardians to render triennial accounts without being cited. That statute, like the one which requires an executor to file an inventory within a month from the date of the letters, imposed no penalty for a disregard of it—certainly none applicable to a case like the present—and it was, consequently, no more than directory. Independent of that, however, the two cases referred to would go far to sustain the present charge; but it is also true that there has, at all times, been more inconsistency of English decision on this head than on any other, and more than is to be found in our own books on all heads together. Perfect consistency is not attainable, and the decisions of our own courts are not free from discrepance in matters of less importance than rules of property; but the aberrations of no American court will bear comparison with the sweeping alterations of the common law by the English judges. On the subject before us their decisions have been habitually loose; and we feel ourselves so far unfettered by foreign precedent as to be at liberty to adapt the rule of a guardian's vigilance to the business habits and transactions of our own people. The principle of accountability for the omission of every measure of imaginary precaution which human sagacity might have foreseen, would be impracticable in a country where counsel cannot be consulted at every step without incurring an expense that would often swallow up the estate. Where the property is small, plain country farmers, unversed in legal niceties, are generally prevailed on by the friends to take charge of it; and from these justice requires no more than a reasonable degree of vigilance, exercised in good faith. It certainly does not require that the office of a guardian should be a trap for the simple. Here there was reasonable vigilance and good faith, and we direct the appellant to be charged with no more than his receipts.

Account reformed accordingly.