Syllabus.

## ESTATE OF PETER FESMIRE, DECEASED.

APPEAL BY ACCOUNTANTS FROM THE ORPHANS' COURT OF
MONTGOMERY COUNTY.

Argued February 6, 1890—Decided April 7, 1890.
[To be reported.]

1. By virtue of his acceptance of a trust, a trustee does not become an insurer of the trust funds against the possibility of loss, nor a surety for his co-trustees. His undertaking is personal, requiring of him good faith and reasonable diligence; and if these requirements be met, he is not liable for losses occasioned by the bad faith or embezzlement of his co-trustees: Hall v. Boyd, 6 Pa. 270; Wilson's App., 115 Pa. 95; Stell's App., 10 Pa. 149; Jones's App., 8 W. & S. 143.

2. When two of three trustees for investment have put it into the power of the third to collect the principal of a mortgage belonging to the trust, it becomes their duty to see that it is properly re-invested. If they neglect this duty, and do nothing for several years beyond inquiring whether the re-investment has been made and ascertaining that the co-trustee has paid annually to the cestui que trust the usual sum as income thereof, they are responsible for his embezzlement of the fund.

(a) Certain trust funds were invested in mortgages held in the names of three testamentary trustees. For convenience the original mortgages and the accompanying bonds were left in the custody of one of the trustees, who lived near the cestui que trust, was in good repute and had been intrusted by the testator with the management of his financial affairs, with authority to collect and pay over the interest on the mortgages. This duty he performed satisfactorily for some years.

(b) Finally, however, without the knowledge of the co-trustees, he entered satisfaction upon one of the mortgages, signing it as acting executor, and received the principal which he embezzled: he also entered judgment on the bond accompanying another mortgage, and had the property embraced therein levied on and sold: the property was bought by his daughter for less than the mortgage debt, and he embezzled the proceeds:

3. The arrangement under which the securities were left with the third trustee, not being shown to have been improvident or an act of negligence on the part of the other trustees, and they having had no reason to anticipate his frauds and having done nothing to render them possible, said co-trustees were not responsible for the embezzlement of the proceeds of these mortgages.

4. A trustee who has embezzled trust funds, for a part of which his co-trustees are responsible upon the ground of negligence, may, upon confessing a judgment in their favor for the amounts so embezzled,

Statement of Facts.

direct that the moneys to be collected thereon shall be appropriated to the payment of the fund for which the co-trustees are liable, and they will have the right to apply it as so directed.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 122 July Term 1889, Sup. Ct.; court below, number and term not given.

On October 21, 1886, Jane Fesmire, widow of Peter Fesmire deceased, petitioned the court below for a citation commanding Josiah Kerper, Peter Fesmire and Ephraim Magargal, executors of the will of said deceased, to show cause why they should not pay to the petitioner certain interest or income, to which, as she alleged, she was entitled under the testator's will, and also why they should not file an account. Peter Fesmire and Ephraim Magargal, two of the executors, answered the petition; and, after argument upon the petition and answer, the court, BOYER, P. J., made a decree directing that the executors file an account of the administration of their trust.

In obedience to the decree of the court, the respondents, Fesmire and Magargal, settled an account, an abstract of which was as follows: The accountants charged themselves "jointly with one Josiah Kerper," the remaining executor, with the sum of $7,306.12, set aside out of the estate of the testator for investment in conformity with the directions of his will; and they claimed credit for the following investments made out of said moneys, to wit: June 11, 1875, investment in bond and mortgage on real estate of Daniel Quillman, at Norristown, $4,000; June 19, 1875, investment in bond and mortgage on real estate of James Shannon, at Norristown, $2,500; July 1, 1875, investment in bond and mortgage on, real estate of Charles W. Sawyer at Philadelphia, $806.12; said investments aggregating $7,306.12, the amount of the fund. Appended to the account was the following memorandum:

· "Note: That the entire income, arising from the investments made as above stated, has been collected and received by Josiah Kerper, one of the executors named in the last will and testament of Peter Fesmire, deceased, said Kerper being the

trusted friend and adviser of decedent in his lifetime and in charge of his, decedent's, investments: That said Kerper alone accounted to the widow of decedent for all moneys collected: That no portion of the income arising from said investments, or the principal thereof, has ever been received or collected by either of the accountants, nor have they any money in their hands belonging to the estate of said decedent."

Exceptions to the account were filed by Jane Fesmire, objecting to the failure of the accountants to charge themselves with any interest, and also objecting to "each and every item of the said account, both in charge and discharge;" whereupon the court appointed *Mr. W. F. Dannehower* auditor, to pass upon the exceptions and report distribution.

The auditor reported, finding the following material facts:

Peter Fesmire died testate in Cheltenham township, Montgomery county, in May 1873. His last will, duly admitted to probate on May 10, 1883, provided, inter alia, as follows: "Item: I order and direct that the one third part of the proceeds of my said real estate, together with the one third part of my personal estate, shall be invested by my hereinafter named executors, or the survivor or survivors of them, in good real-estate securities, and the interest or income thereof shall be paid by my said executors half yearly unto my wife, Jane Fesmire, during all the term of her natural life; and after her decease the said one third part of the proceeds of my said estate, real and personal as aforesaid, shall be equally divided among my following named children," naming them.

Josiah Kerper, one of the three executors, resides in the Twenty-third ward of the city of Philadelphia, near Frankford, and has resided there since 1833. The testator resided only about half a mile or a mile from Kerper, for a period of twenty years immediately prior to his decease, and during that period intrusted Kerper with the transaction of all of his financial affairs. Kerper in early life was a school teacher, then kept store, was a conveyancer and placed loans for other people, and settled up estates. At one time he had, invested, $90,000 of other people's money, and, at another, settled up an estate amounting to $200,000. He was trusted by everybody, and his character for truth and veracity was unquestioned. At the time he was appointed one of the testator's executors, and up

Statement of Facts.

to January, 1886, he possessed a large amount of property, and was reputed to be worth from $50,000 to $60,000. Peter Fesmire, Jr., also a co-executor, is a step-son of said Jane Fesmire, the widow of Peter Fesmire, Sr., the testator aforesaid, and resides in Moreland township, Montgomery county. Ephraim Magargal, another co-executor, was a son-in-law of the testator, and has been for thirty-six years a resident of New Castle county, in the state of Delaware.

On June 10, 1875, the executors aforesaid filed their first account which showed a balance of $21,918.38 due the estate. The account was subscribed by all the said executors, not at the end thereof, however, but following the items of charges, and was sworn or affirmed to by all three before the deputy register. On the back of the third and last page of their account, the executors made a "Distributive Statement of the Estate of Peter Fesmire, under the Will," distributing said balance of $21,918.38. The first item in the distribution is as follows: "To be retained by executors and invested by them for the benefit of the widow, $7,306.12."

This trust fund was in the hands of Ephraim Magargal, one of the co-executors. He paid to B. E. Chain, Esq., of Norristown, counsel for the executors, for investment under the will, as follows: On June 10, 1875, $4,000, by check on the First National Bank of Wilmington, Delaware; and a few days later $2,500; and paid to Josiah Kerper, co-executor, the balance of said fund, $806.12, also for investment. Mr. Chain purchased, with $6,500 trust moneys placed in his hands by Mr. Magargal, assignments of mortgages, as follows, to wit: Mortgage given by Daniel Quillman to Samuel Freedley for $4,000, on real estate in Norristown, and mortgage given by James Shannon to Samuel Brown, for $2,500, on Norristown real estate, the assignments of these mortgages being taken in the names of all three of the executors. Mr. Kerper invested the $806.12, the balance of said trust fund, placed in his hands by his co-executors, in a mortgage upon real estate in Frankford, Philadelphia, given by Charles W. Sawyer to the three executors of Peter Fesmire, deceased. It was agreed by the counsel for the accountants and for the exceptant that the first two mortgages named were first liens on real estate in each described, worth at least double the face value of each mortgage respectively.

Statement of Facts.

After making these investments the physical custody of the securities was intrusted by the other co-executors to Josiah Kerper, who was to collect the income arising therefrom and pay the same over to the widow, because he was the head executor and resided nearest to the testator's widow. Neither of the other two co-executors ever collected a dollar of the income. Each occasionally saw the widow and also Josiah Kerper, and learned that the income was being regularly paid over by Kerper. Fesmire inquired of Kerper every year about the investments and was told by him that they were in the original mortgages.

On November 26, 1880, Mr. Kerper, without the knowledge or consent of his co-executors, entered judgment in the Court of Common Pleas No. 2 of Philadelphia, upon the bond which accompanied the mortgage for $806.12, and on the same day issued execution upon said judgment. The real estate described in said mortgage was sold under a venditioni exponas issued December 2, 1880, by the sheriff of the city and county of Philadelphia, on January 3, 1881, to Martha E. Kerper, daughter of Josiah Kerper, for $600, and a deed poll was delivered to her for said premises.

On April 1, 1882, without the knowledge or authority of his co-executors, Mr. Kerper entered full satisfaction for principal and interest upon the margin of the record of the $2,500 mortgage aforesaid, in the recorder's office, at Norristown, he alone signing and sealing the entry of satisfaction as "acting executor."

Sometime in 1883, Kerper represented to Magargal that the holders of the $4,000 mortgage wanted to pay it off, as they had sold the property against which said mortgage was a lien; and that he desired to re-invest the $4,000 in other property. Mr. Kerper represented to Mr. Fesmire, his co-executor, that the $4,000 mortgage was to be satisfied of record, and the same money was to be loaned to the same man on another property, and a new mortgage was to be given. Magargal and Kerper went before a commissioner of deeds for Pennsylvania, residing at Wilmington, Delaware. Kerper told the commissioner he wanted a release or transfer of a mortgage at Norristown to satisfy a claim, and Magargal, without having the paper he signed read to him, signed and acknowledged an

Statement of Facts.

assignment of said mortgage for $4,000.  Said assignment was also signed and acknowledged by Kerper and by Fesmire.  It is dated October 1, 1883, and was recorded in the recorder of deeds' office at Norristown on October 17, 1883.  It is made to Jacob Craft and stipulated that the sum of $4,000, together with interest from October 1, 1883, was still due and unpaid. The principal of said mortgage and interest to October 1, 1883, was paid to Kerper, and no portion of the money ever came to the hands of Magargal and Fesmire.  After the execution of said assignment Fesmire saw Kerper, and was told by him that he had invested the money at 5 per cent, by leave of court.

Kerper continued to pay interest accruing upon said mortgages to the widow of said testator, up to October, 1885, when there was a deficit of $50 on the interest due upon all of said mortgages.  The widow promptly notified Magargal of Kerper's deficit in the payment of income and Magargal at once informed his co-executor, Mr Fesmire.  Both called on Kerper on or about February 6, 1886.  Kerper explained his default by stating he had not collected the interest.  He also stated that the securities of the trust fund were in Philadelphia, but were not in proper shape.  He wanted time until March 1st, following, to have them in readiness.  On the following day Magargal and Fesmire employed counsel.

Upon the information of Mrs. Fesmire, Kerper was arrested on the charge of embezzlement.  On March 3, 1886, Kerper confessed judgment to Peter Fesmire and Ephraim Magargal, executors of Peter Fesmire, deceased, for $7,306.12, payable one month after date, and interest, together with five per cent collection fee, waiving inquisition, condemnation, and all appraisement, stay, and exemption laws.  On the same day judgment for said amount was entered up against Kerper and in favor of said Fesmire and Magargal, executors as aforesaid, in the Court of Common Pleas No. 4, of the city of Philadelphia.  On March 31, 1886, an agreement was entered into in writing, but really made verbally at the time of confessing judgment as aforesaid, between Josiah Kerper of the first part, and Peter Fesmire and Ephraim Magargal, of the second part, which recited the facts of the probate of said Peter Fesmire's last will and testament and the appointment of said executors, the execution of their trust and the investment of said bal-

### Statement of Facts.

ance of $7,306.12, the nature and character of the trust securities, Kerper's embezzlement and his desire to save harmless his co-executors from loss by reason of his acts with regard to said securities, and then proceeded as follows, to wit:

"Now, know all men by these presents that I, the said Josiah Kerper, do hereby acknowledge and declare that I have given my judgment note dated the third day of March, 1886, for the sum of $7,306.12, as a collateral security,

"1. To secure the payment of the sum of $4,000 received by me from the proceeds of the mortgage hereinbefore mentioned, given by Daniel Quillman to Samuel Freedley, and duly assigned to me jointly with the said Peter Fesmire and Ephraim Magargal.

"2. To secure the payment of the said sum of $806.12, invested in bond and mortgage secured upon real estate in Frankford, Philadelphia, which was secured by me.

"And after the payment of the above sums I further agree that the same be held as a collateral security to secure the payment of the aforesaid sum of $2,500, should the said Peter Fesmire and Ephraim Magargal be unable to collect the same, and should the said Fesmire and Magargal collect the same from the owner of the real estate covered by the said mortgage, then to be held in trust to pay the owner of said real estate the loss sustained by him, provided that the said sums of $4,000 and $806.12 shall be first paid out of any sales of my real estate upon the judgment note herein referred to. It is mutually agreed by and between said parties that the giving of said judgment and the signing of this agreement shall in no way ratify or confirm the action of the said Josiah Kerper in entering satisfaction of said mortgage of $2,500, but the same shall be and remain the same as if the note had not been given, or agreement executed, and shall not be treated or considered as having been taken in payment of said several sums of money, or any part thereof, but only as a collateral security for the same, and for the better protection of all parties in interest in this matter. This not to prevent the said Fesmire and Magargal from forthwith proceeding to collect said note out of my real estate."

Kerper's co-executors with due diligence proceeded to restore as much of the squandered trust fund as possible. On April

6, 1886, a scire facias sur mortgage was issued out of the Court of Common Pleas of Montgomery county, on the $2,500 mortgage, by the executors of Peter Fesmire, deceased, who claimed that the entry of satisfaction upon the record of said mortgage was null and void, because all the co-executors or co-trustees should have united in the satisfaction. They caused execution to issue on the judgment confessed to them by Kerper, and on June 8, 1886, had Kerper's real estate sold at sheriff's sale, and became the purchasers thereof. The sheriff's deed poll, dated June 26, 1886, was made to Peter Fesmire and Ephraim Magargal as individuals, and not as executors or trustees, for fear of trouble, as Kerper had not yet been removed as co-executor, but they treat the property as held in trust. A portion of that property, to wit, the house in the 23d ward of Philadelphia, and one and one half acres of land, Fesmire and Magargal sold for $3,000 and with the proceeds satisfied a mortgage for $3,000, secured upon the remaining portion of Kerper's property, sold at sheriff's sale aforesaid. Said remainder, Fesmire and Magargal still hold, and it is worth $7,000 or $8,000, less $4,000 encumbrances. Kerper's co-executors do not derive any income from the property still in their hands. They expended about $1,500 to protect the property.

—Discussing at length the legal questions arising upon the facts so found, the auditor reported his conclusions of law in substance as follows:

1. That as the accountants had joined with Kerper in settling the executors' account in 1875, the confirmation of which was an adjudication of a joint liability with him; as all three of the executors had jointly accepted the trust for investment under the will, and had made the investments in their joint names; and, as these accountants, when cited by the court to file an account, again acknowledged their joint liability by jointly charging themselves with the whole amount of the trust fund and taking credit for the investments, they were by these solemn, deliberate and repeated admissions and the adjudication of their joint liability, estopped from disclaiming liability by reason of facts occurring prior to the filing of the account now under consideration, even if they were not absolutely concluded by their admission of liability in filing their executors' account and the subjoined distributive statement.

Statement of Facts.

2. That if the foregoing conclusion should be held erroneous, and the liability or non-liability of the accountants was to be determined upon a consideration of all the facts found by the auditor, then, as the securities were placed in the hands of Kerper for convenience merely, and not of necessity; as the will contemplated joint action, and the executors' account fixed a prima facie joint liability, it was the duty of the accountants to keep the securities where all or either could exercise a control or supervision, and their merely inquiring once a year, during fourteen years, whether the income was paid to the widow, without assuring themselves that the securities were intact, was culpable negligence on their part, under all the circumstances, and they should therefore suffer for their co-trustees' default.

· 3. That if, however, the view should be adopted that there was no breach of trust, on their part, up to the time of the joint assignment of the $4,000 mortgage, then, as they executed that assignment relying entirely upon Kerper's representations, without making any inquiry as to the security in which he represented the money was to be re-invested, and without taking any pains to see that the proposed re-investment was actually made, they were grossly and supinely negligent, and were therefore liable for the loss of that $4,000; and, being so liable, and admitting that through their diligence they have in their possession, for the purposes of the trust, property worth more than enough to cover the amounts of the other two mortgages, they were as a necessary consequence liable for the whole fund.

4. That, being liable for the principal of the trust fund, the accountants were necessarily liable for the income which should have been derived therefrom; that no credit for commissions could be allowed them upon a fund for which they denied they were accountable, and that they were liable for the expenses of the audit.

The auditor accordingly re-stated the account by adding to the debit side a charge for interest at 6 per cent upon the entire trust fund from July 1, 1875, to April 1, 1889, and modified the credit side so as to exhibit balances in the hands of the accountants amounting to $7,306.12 of principal, and $2,461.02 of interest, the latter balance being the difference between the amount of interest with which the accountants were debited

by the auditor, and the aggregate of the payments of income made by Kerper to the widow, and said balance the auditor awarded to the widow.

The accountants excepted inter alia to the surcharge by the auditor with the mortgage of $2,500 and interest thereon; [2] with the mortgage of $806.12 and interest thereon; [4] and with the mortgage of $4,000 and interest thereon. [6]

After argument the court, SWARTZ, P. J., disposed of the exceptions in an opinion which, after reciting the principal facts, continued:

Are the accountants liable for the default of their co-trustee under the facts found by the auditor?

The Quillman mortgage was a first-class investment. It stood in the names of the three executors. Mr. Kerper was intrusted with the custody of the mortgages. This was proper, because by the appointment of Kerper the testator recommended him to the confidence of the son and son-in-law. He was the trusted adviser of the father, a man of reputed means and business experience. He lived near the widow where the income was payable. There could be no divided custody of the paper; only one of the three could have the actual possession. As was said in Lightcap's App., 95 Pa. 458, "In trusting him, the assets were surely not culpably and negligently parted with." See also Jones's App., 8 W. & S. 151.

We cannot agree that their liability was conclusively established by reason of the original joint account in which they admitted the balance was in their hands. "It by no means follows that such joint liability is a continuing obligation, which remains fixed and established as a judicial decree and without regard to subsequent circumstances:" Young's App., 99 Pa. 84. By this account they admitted that they had in hand the fund for investment, and they are prima facie liable for its safe-keeping. After the original accounting, they entered upon the duties of the trust and made the investment as directed by the will. Are these subsequent equitable circumstances to discharge them from this prima facie liability?

Kerper called upon his co-trustees with a paper which he asked them to execute. He stated to Mr. Magargal that the mortgagor sold the property and wanted to pay off the mort-

Opinion of Court below.

gage; that the same man would give another mortgage on other property. He stated to Mr. Fesmire that the mortgage was to be paid off, and the money was to be invested in the other property. The accountants then signed the paper without reading it, or having it read. The writing was in fact an assignment of the mortgage, dated October 1, 1883, in favor of one Jacob Craft. Kerper obtained the money on this assignment but never accounted for the same. The evidence discloses but a single inquiry by Mr. Magargal as to this proposed new investment. He asked Kerper about the money, who answered that it was invested at five per cent; that the court authorized him to invest at this lower rate. The other executor made no inquiry whatever about the proposed subsequent loan.

The foregoing facts are not sufficient to discharge the accountants from their original admitted joint liability. They delivered the assignment to their co-executor and ought to have known that he would receive the money, and yet they make no effort whatever to ascertain whether the funds were safely re-invested. Their duty to seek a proper re-investment was as imperative as their duty to seek a safe original investment. They were appointed to execute the trust, and their first duty was to ascertain whether a good real-estate security was obtained. They made no effort to learn where the re-investment was made, whether in bonds, stocks or mortgages. If interrogated they could not have answered where the property securing the loan was located, what it consisted of, or what was its estimated value. This state of affairs continued for two years.

Having undertaken a joint trust and assumed a joint liability, they cannot escape all liability by folding their arms and remaining silent and indifferent to all that their co-trustee may do. If they had read the paper executed by them, they would have learned that their co-trustee was practicing a deceit upon them. He claimed the mortgage was to be satisfied, when in reality he was selling the security. After a joint confessed liability, they could not divest themselves of all care for the money: Perry on Trusts, 418; Ducommun's App., 17 Pa. 268; Vandever's App., 8 W. & S. 405; Sterrett's App., 2 P. & W. 419; Pim v. Downing, 11 S. & R. 66. The auditor finds that the

accountants were negligent, and that they failed to exercise a single act of discretion in relation to the $4,000 re-investment. He holds them liable for the loss. We approve of his conclusion, because the circumstances subsequent to the admitted liability afford no equitable ground for relief.

Our discussion of the $4,000 mortgage brings us to the conclusion that the accountants are not liable for any loss that may have resulted from the satisfaction by Kerper of the $2,500 mortgage. The investment was a proper security, so found by the auditor. The satisfaction was made without the knowledge or consent of the co-executors. They gave proper attention to the original investment and had no reason to suspect the fraud of the co-executor. As already shown there was no impropriety in giving Kerper the custody of the mortgage. They found the interest was regularly paid from year to year. Their co-executor told them from time to time that the investment still continued in the original security.

We must remember the confidence the testator gave this co-executor. It was not necessary that the co-executor should from time to time demand the production of the securities for their inspection. In Jones's App., 8 W. & S. 151, it was said, " to require them to have dealt with their colleague as a rogue, by calling for the securities, would require of them the highest and most exact vigilance, a degree of it that was inconsistent with the relation which the testator had established betwixt them." This language is approved in Irwin's App., 35 Pa. 297, and in Lightcap's App., 95 Pa. 458. In the last case, the circumstances are very similar to those at bar. How could these accountants have protected themselves? Suppose they examined the securities every few months, their co-executor could still on the very day after such an examination, perpetrate the same fraud. If a co-trustee is liable under such circumstances, he is never safe in undertaking the execution of a joint trust. If this is the law he must of necessity guarantee the honesty of his colleagues. Such a rule is both harsh and unwarrantable : Hall v. Boyd, 6 Pa. 270 ; Lightcap's Appeal, supra. In the case just cited, the testator created a trust to be executed by his executors. They sold the real estate and received part in cash and secured the balance of the proceeds of sale in purchase-money mortgages in the names of the three

executors. The papers were entrusted to one of their number, who without the knowledge or authority of the others entered satisfaction of the mortgage, obtained the money and absconded with it. The court held that the co-trustees not participating in the satisfaction were not liable. It was further held that if the law gives one power to satisfy without and notwithstanding his co-trustees, it is but just that he alone should be made responsible; if he has not the power, then the estate loses nothing by the act of the co-trustee. If then, the $2,500 were lost, we fail to find any good ground for holding the accountants liable for this loss.

But the accountants claim that the mortgage is still a subsisting security; that the satisfaction by Kerper was ineffectual and did not discharge the premises from the lien of the mortgage. The accountants were executors, but the investment was made in pursuance of the trust created in the will. As soon as the trust fund was set apart and taken for investment, the executors assumed the duties of the trust and were liable as trustees: Aston's Est., 5 Wh. 228. The fact of the trustees being also executors did not give each trustee, qua trustee, authority to deal exclusively with the property: Bohlen's Est., 75 Pa. 316.

The obligation of a joint liability implies the power to fulfil it; but if one trustee may satisfy a mortgage without the consent or knowledge of his co-trustees, then such co-trustees are denied the power to fulfil their obligations. Trustees are to unite in the execution of the trust for the protection of the trust estate: Beltzhoover v. Darragh, 16 S. & R. 329; De Haven v. Williams, 80 Pa. 480; but of what avail is all this care in the investment, if one of the joint trustees may undo all that was done by the joint act? There is but one safe rule, under such circumstances, and that is to require all to unite in or assent to the satisfaction. This will protect all the joint trustees and the trust estate. Such requirement is no hardship to the debtor, for his obligation discloses to him upon its face that it is payable to trustees. We cannot follow the reasoning in Vandever's Appeal, Bohlen's Estate, Lightcap's Appeal and De Haven v. Williams, without reaching the conclusion that these cases establish the rule just given. We therefore hold that the accountants must be charged with the

Opinion of Court below.

money represented by this security, because it is a subsisting lien against the premises described therein.

But if we are in error as to this, we do not see how the accountants can complain of our ruling. They filed their accounts in obedience to the citation, and in it they charge themselves with the money and take credit for the security as a continuing valid mortgage in their hands. They cannot object if we charge them with that which they admit is in their hands. They fix the investment as a valuable security for $2,500, and we simply sustain their claim. If they are without the interest, it is the result of their own negligence. Suit was brought on the mortgage three years ago, but they failed to press the suit to judgment.

The mortgage of $806.12 was foreclosed by Kerper without the knowledge or authority of the accountants. Originally, Magargal passed over this money to his co-executor Kerper, for investment. The mortgage was foreclosed more than five years before the accountants discovered the fact. It may be argued that the accountants were guilty of such negligence or total indifference to this investment as to make themselves liable for the loss, but we need not decide this question, for the auditor finds that the fraudulent trustee has put into the accountant's hands property worth $3,500, to be used towards making good his default. The accountants say, first, that this property is to be used in making good the misapplication by Kerper of the $4,000, and secondly, that this property now in their hands brings in no income. We decided that the trustees were jointly liable with Kerper for this $4,000, and as between the accountants and the trust estate, the trust estate must be made whole before the accountants can appropriate this $3,500 to make good their own loss. It is true that the property at this time brings in no income, but this results from the fact that the accountants hold the property in the hope thereby to secure an advanced price, and make good the loss they may sustain by their own negligence and their co-trustee's default. This is no valid excuse. If they desire to hold the property for such advanced price, let them first restore the trust fund. The widow is entitled to her income. She must not be made to suffer to enable them to make gain. They are liable for this $806.12, because they have in their hands more than four times this sum deposited with them to make good the loss.

Arguments.

The report of the auditor, except as modified by the foregoing opinion, is confirmed, and the exceptions so far as they are not sustained by the aforesaid opinion are dismissed.

—The court thereupon entered a decree restating the account substantially in the same manner that the auditor had done, but finding a smaller balance of interest in the accountants' hands, awarding said balance to the widow, and directing that the accountants pay the cost of audit. Thereupon the accountants took this appeal, specifying that the court erred:

2, 4, 6. In not sustaining their exceptions to the auditor's report.[2][4][6]

*Mr. W. Horace Hepburn* (with him *Mr. Theodore W. Bean*), for the appellants:

1. On making the investments in compliance with the directions of the will, the duties of the accountants as executors ceased; they then assumed the position of trustees, and they are now accountable only as such: Geddis v. Irvine, 5 Pa. 508; Aston's Est., 5 Wh. 241; Hill on Trustees, § 237. The account in question was filed by the appellants as executors, and covers simply the period between the filing of their account in 1875 and the investment of the funds as directed by the will. And it was accompanied with a disclaimer of any liability as trustees. And yet we are told that they presented the $2,500 mortgage as a subsisting security. They were compelled to file that account, as the order on them to do so was not appealable: Eckfeld's App., 13 Pa. 172. The charging of the accountants with liability for not collecting the $2,500 was harsh and unjust. Why should not the estate stand the risk of its collection, when the satisfaction entered on it was entirely the act of Kerper? And suppose that in the end that satisfaction is held good; how then can the court undo what it has done?

2. There is no justification for the statement by the court below, that the accountants are holding the property they have recovered for an advanced price. The finding of the auditor and the evidence are to the contrary. If the position of the court below is correct, the accountants are liable to the widow for not selling at whatever price they can get, while on the other hand they would be liable to the remaindermen if they

Arguments.

should sell at a sacrifice: Leslie's App., 63 Pa. 355; Dundas's App., 64 Pa. 325. A trustee will not be chargeable for more than he receives, in the absence of fraud: Moore's App., 10 Pa. 435; Springer's Est., 51 Pa. 342. The accountants are not liable for the mortgages of $2,500 and $806.12: Lightcap's App., 95 Pa. 455. Nor are they liable for the $4,000. It is not correct that they did not know the nature of the paper signed by them. They joined in that assignment for conformity, with the object of placing the fund in Kerper's hands for re-investment, and the only way in which the money could be paid to Kerper, as the security stood, was by their joining in some such paper.

3. The joining in such a paper, for the purpose aforesaid, was not such negligence as to hold the non-receiving trustees liable: Attorney General v. Randall, 21 Vin. Ab. 534; Vandever's App., 8 W. & S. 405; De Haven v. Williams, 80 Pa. 480; Jones's App., 8 W. & S. 151. So, securities, such as mortgages, may be entrusted to one of several trustees for the collection of the income thereon, without rendering the co-trustees liable: Jones's App., 8 W. & S. 151; Lewin on Trusts, *681; Hall v. Frank, 11 Beav. 519; Lightcap's App., 95 Pa. 455. The testator held Kerper out as worthy of confidence, and in trusting him the accountants did exactly as the testator would have done, conducting themselves as men of ordinary prudence in the particular circumstances. They are therefore not liable for having trusted him: Lewin on Trusts, *253. When a co-trustee gets possession of the fund by fraud or crime, the others are not liable: Perry on Trusts, 523. When a proper investment is once made, the joint liability terminates: Glenn v. McKimin, 3 Gill 366. Kerper had the right to direct the application of the private funds turned over to the accountants: Selfridge v. Bank, 8 W. & S. 320; Pennypacker v. Umberger, 22 Pa. 492. Any surcharge is premature, until Kerper's property is shown to be exhausted.

*Mr. Charles Hunsicker* (with him *Mr. James H. Shakespeare*), for the appellee:

1. The three executors were bound as trustees, not only to make safe investments, or investments under the directions of the Orphans' Court, but also to see thereafter that each in-

vestment remained safe; and the same rule applies to re-investments. The accountants knowingly placed the $4,000 in the hands of Kerper for investment, when they executed the assignment of the Quillman mortgage, and relied wholly upon him. This was supine indifference. In addition, when cited by the court they filed a joint account charging themselves, as trustees, with the Quillman mortgage and the other mortgages, as valid and subsisting securities. This account expressly makes them liable, and their foot-note to it does not relieve them from responsibility: Ducommun's App., 17 Pa. 268. The facts above stated distinguish the case from the authorities cited by the appellants.

2. When one executor or trustee pays money over to the other, or actively assists to have it put into the other's hands, he is liable: Sterrett's App., 2 P. & W. 419; Perry on Trusts, 418; Clark's App., 18 Pa. 175. Again; executors are distinguishable from trustees; to the execution by the latter of an authority delegated for mere private purposes, the concurrence of all is necessary: De Haven v. Williams, 80 Pa. 480; Sinclair v. Jackson, 8 Cow. 533; Vandever's App., 8 W. & S. 405. The statement by the court of the purpose for which the accountants were holding the property recovered from Kerper, was fully justified by the evidence and the auditor's findings. The accountants agree that they are liable for the $2,500 mortgage, and claim that it is still a subsisting lien, and if that is so, they are not injured. Kerper had no right to direct the appropriation of the moneys to be realized on the judgment given by him. The paper looks very much like an arrangement at the instance of the accountants. The judgment was given to secure the whole amount embezzled, and the law of appropriation applies only to debts, not to torts.

OPINION, MR. JUSTICE WILLIAMS:

The testator died in May, 1873. He directed his executors to convert his estate, real and personal, into money, and, as to one third of the proceeds, to invest the same in "good real-estate securities," and pay the income thereof semi-annually to his wife, Jane Fesmire, during her natural life, and after her death then over to his children, or their representatives absolutely. He named his executors in these words: "I nominate

Opinion of the Court.

and appoint my friend Josiah Kerper, my son Peter Fesmire, and my son-in-law Ephraim Magargal, the executors of this my last will and testament." In June, 1875, the executors settled their account in the Orphans' Court, showing the performance of the duties imposed by the will in the sale of the property of the testator and the appropriation of the proceeds, and that they had ready for investment the one third of the entire fund, amounting to $7,306.12, for the purpose of raising an income for the widow. This account was confirmed. The fund in hand was then invested in three mortgages, which, it is conceded, were "good real-estate securities," and the executors held these mortgages thereafter as trustees under the trust created for Jane Fesmire by the terms of the will. Kerper lived near the widow, had been the trusted friend of the testator for years, was in active business, and apparently a prosperous man. Fesmire, the son, lived in another part of the county, and at a considerable distance from the widow. Magargal lived in the state of Delaware. Both were farmers, in moderate circumstances, living on and cultivating their farms. Neither of them was able to attend to the collection of the interest on the mortgages and its payment to the widow, without considerable inconvenience and expense. The mortgages were therefore left in the custody of Kerper, as the one of their number most conveniently situated and best qualified to act in the premises, and he undertook to collect and pay over the interest. For about ten years he discharged the duty faithfully, and made prompt payment of the interest collected. In October, 1885, he failed to pay the interest falling due, and the widow at once made complaint to Fesmire and Magargal. They gave the subject prompt attention; and soon learned, to their great surprise, that Kerper had attempted to embezzle the proceeds of all the mortgages, and was in failing circumstances. They at once began proceedings to remove Kerper from the trust and to recover the trust funds. The widow is now endeavoring to hold them responsible for the interest which the money embezzled by Kerper should have earned, if he had not gotten it into his own hands, and the court below held that they were liable to her for it, although no part of it has ever come into their hands. It is from this ruling that the appeal in this case was taken.

Opinion of the Court.

The general rule in relation to the liability of co-trustees is well settled in this state. They are responsible, ordinarily, for their own acts and omissions, but not for those of their associates. So, an executor will not be liable for a devastavit committed by his co-executor, unless he has contributed in some manner to it: Brightly's Eq., 359. The statement of the rule by COULTER, J., in Hall v. Boyd, 6 Pa. 270, is referred to by several of the later cases as the best statement of the rule to be found in our books, and it is cited with approval so recently as Wilson's App., 115 Pa. 95. It is in substance, that the act of one of several executors in relation to the testator's goods, as in making sale, delivering possession, or receipt of the price, is the act of all, as all have authority to do the act; but each is liable individually no further than assets have come to his hands, except for his own fraud or negligence. It may be necessary for trustees to join in executing receipts for money in many cases, but the fact that they do so join is not conclusive evidence that they are jointly liable; for, in the absence of fraud and negligence, each will be held liable only for what he actually receives: Stell's App., 10 Pa. 149; Wilson's Appeal, supra. The law requires of a trustee fidelity to the trust, and the exercise of the same measure of diligence that a man of ordinary prudence may be expected to exercise in the care of his own property under the same circumstances: Jones's App., 8 W. & S. 143. A trustee does not become, by virtue of his acceptance of the trust, an insurer of the trust funds against the possibility of loss, nor a surety for his co-trustee. His undertaking is personal, and requires of him good faith and reasonable diligence. If these requirements are met, he is not liable for losses occasioned by the bad faith or the crimes of his co-trustees. The appellants must be judged by this standard.

The trust funds in this case were invested in three mortgages. One of these was for $4,000, one for $2,500, and one for $806.12, to which we will refer as Nos. 1, 2, and 3, respectively.

In October, 1883, Kerper represented to his co-trustees that the land covered by mortgage No. 1 had been sold by the owner, who wished to pay the money, and have the mortgage satisfied to enable him to make title to the purchaser. He stated at the same time that he had an opportunity to loan the

money again on real estate in Norristown. At his instance, both Fesmire and Magargal executed an assignment of the mortgage, and left it in his hands to enable him to satisfy it. He received the $4,000, and, instead of re-investing it, he embezzled it, but paid the interest regularly until October, 1885, to the widow. Neither Fesmire nor Magargal gave any attention to the re-investment of this money, and both of them were ignorant of Kerper's misconduct until they discovered it after notice from the widow that she had not been paid the interest due her in October, 1885. During the two years intervening, Kerper was in active business and in good repute; and as he paid the interest punctually, there was nothing to call the attention of the appellants to this subject. But, when they put it in Kerper's power to collect the money on the mortgage, it became their duty to see that it was again invested in " good real-estate security: " and if they had not neglected this duty the loss would not have been sustained. They did neglect it. The embezzlement was made possible because they neglected it, and their liability grows out of their negligence. We think the learned judge of the court below was right in holding them liable for the loss of the proceeds of mortgage No. 1.

An examination of mortgage No. 2 disclosed the fact that Kerper had received the money due upon it, and attempted to satisfy it by his individual receipt. He never consulted his co-trustees in regard to the satisfaction of this mortgage, and when they discovered what he had attempted to do, they promptly disavowed his act, and began proceedings for the enforcement of the lien and the collection of the money, which are still pending. If the money is collected, it will be their duty to see to its investment at interest, as required by the will. If it is not collected because of the fraud of Kerper, they have neither done, nor omitted to do, anything which has contributed to render that fraud possible, or which can make them responsible for its consequences.

Precisely the same thing is true of mortgage No. 3. The appellants knew nothing of Kerper's effort to get the money due upon it into his hands, until they learned it in the course of their investigations in the fall of 1885. It was a circumstance they had no reason to anticipate, and they are charge-

Opinion of the Court.

able with no negligence in regard to it. The arrangement under which these mortgages were left in the possession of Kerper, and he authorized to receive the interest upon them for the benefit of the widow, was, in the light of all the circumstances that led to it, a reasonable and proper one. For ten years it was a satisfactory one. It is not now alleged that it was improvidently made, or that suffering the securities to remain in the hands of their co-trustee, who equally with themselves was entitled to their custody, was an act of negligence on the part of the appellants. There is, therefore, no reason for holding them personally liable for Kerper's embezzlement, or his attempt to embezzle the proceeds of mortgage No. 3.

The wrong that has been done has been the work of Kerper alone, so far as mortgages Nos. 2 and 3 are concerned. As to No. 1, the appellants put it in his power to satisfy the mortgage, and take the proceeds into his own hands; and then they neglected to perform the duty which the will imposed, viz., to see to its investment in good real-estate securities. Because of this neglect, they are liable for the amount of mortgage No. 1. Their duties as trustees require them to be vigilant and active in their efforts to recover on mortgage No. 2, and to convert into money the securities received from Kerper for the purpose of indemnifying them against his embezzlements. They must use due diligence to restore the trust funds, and provide an income for the widow; but they cannot be compelled to pay out money which they never received, and for the loss of which they are not accountable.

A question is raised over the contract between Kerper and the appellants bearing date March 31, 1886. When charged with his embezzlements, Kerper put such securities as he had in the hands of his co-trustees; and, by the contract between himself and them, he directed in what manner the money obtained on the securities should be applied. The order of application was, first, to the payment of the $4,000 received on mortgage No. 1, which was wholly lost to the trust unless it could be realized from the securities which he turned over under the terms of this contract; next, to the payment of the amount of mortgage No. 3, which had been received by him as the result of legal proceedings taken for its collection; last, to the payment, either to the trustees, or to the mortgagor, if

compelled to pay the mortgage by virtue of the proceedings
now pending, of the amount of mortgage No. 2. As these se-
curities were furnished by Kerper, he had a right to direct
their appropriation. In the exercise of that right, he seems to
us to have acted properly, and to have been just to his co-
trustees, without the least unfairness towards his cestui que
trust. The wrong done by him was in the attempt to embezzle
the entire fund, which, as trustee, it was his duty to protect.
The contract of March 31, 1886, was an effort to make amends
for this wrong, and restore the fund, as far as the securities
would reach; and the appellants have a right to apply the
moneys received upon them in accordance with the terms of
the contract.

> The decree is reversed, and record remitted, with
> directions to re-state the account in accordance
> with this opinion.