J-S73034-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JULIO ERIGUE MELECIO, | : | |
| | : | |
| Appellant | : | No. 1101 MDA 2019 |

Appeal from the PCRA Order Entered June 5, 2019
in the Court of Common Pleas of York County
Criminal Division at No(s): CP-67-CR-0002388-2016

BEFORE: SHOGAN, J., LAZARUS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED: FEBRUARY 3, 2020**

Julio Erigue Melecio ("Melecio") appeals from the Order denying his first Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"). ***See*** 42 Pa.C.S.A. §§ 9541-9546. We affirm.

On September 14, 2017, following a jury trial, Melecio was found guilty of one count of rape and two counts of involuntary deviate sexual intercourse.[1] The trial court sentenced Melecio to an aggregate term of thirty to sixty years in prison. This Court affirmed the judgment of sentence. ***See Commonwealth v. Melecio***, 200 A.3d 550 (Pa. Super. 2018) (unpublished memorandum). Melecio did not file a petition for allowance of appeal with the Pennsylvania Supreme Court.

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1).

On January 7, 2019, Melecio, *pro se*, filed the instant timely PCRA Petition. The PCRA court appointed Melecio counsel, who filed an Amended Petition. On June 4, 2019, following a hearing, the PCRA court denied Melecio's Petition. Melecio filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

On appeal, Melecio presents the following claim for our review:

> Whether the [PCRA c]ourt's denial of [Melecio's] Petition for [p]ost-[c]onviction [c]ollateral [r]elief and failure to find [that trial] counsel was ineffective was an abuse of discretion[,] where trial counsel failed to introduce into evidence the testimony and/or repo[r]t of Dr. Suzanne Rotolo[,] which noted discrepancies and issues with the ["SAFE"][2] exam conducted on the victim[,] and said evidence would have countered the [testimony of] the expert witness, [SAFE] nurse Patti O'Brien, [who was] called by the Commonwealth?

Brief for Appellant at 3.

"The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error." *Commonwealth v. Weimer*, 167 A.3d 78, 81 (Pa. Super. 2017). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." *Id.* (citation omitted).

Melecio alleges that his trial counsel, James Rader, Esquire ("Attorney Rader"), was ineffective in failing to call Susanne Rotolo, M.D. ("Dr. Rotolo"), to testify as an expert witness at trial. *See* Brief for Appellant at 9-17. Melecio

---

[2] "SAFE" is an acronym for "Sexual Assault Forensic Examiner." *See* N.T., 9/12/17, at 182.

claims that Attorney Rader's explanation for not calling Dr. Rotolo as a witness—that Dr. Rotolo's testimony would have been redundant with his cross-examination of SAFE nurse Patti O'Brien ("O'Brien")—was unreasonable, because Attorney Rader failed to elicit from O'Brien all of the information to which Dr. Rotolo would have testified. *Id.* at 13-17. Specifically, Melecio claims that Dr. Rotolo would have testified that O'Brien could not determine, by the nature of the victim's bruising, whether (1) Melecio's sexual contact with the victim was non-consensual, and (2) the bruising was caused by Melecio's sexual contact with the victim. *Id.* Melecio states that he was prejudiced because the additional information may have led the jury to find him not guilty. *Id.*

To prevail on a claim of ineffective assistance of counsel under the PCRA, a petitioner must plead and prove, by a preponderance of the evidence, that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). Specifically,

> [t]o be entitled to relief on an ineffectiveness claim, a PCRA petitioner must establish: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) he suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different. ***Commonwealth v. Chmiel***, … 30 A.3d 1111, 1127 (Pa. 2011) (employing ineffective assistance of counsel test from ***Commonwealth v. Pierce***, … 527 A.2d 973, 975-76 (Pa. 1987)). Counsel is presumed to have rendered effective assistance. Additionally, counsel cannot be deemed ineffective for failing to raise a meritless claim. Finally, because a PCRA petitioner must

- 3 -

establish all the ***Pierce*** prongs to be entitled to relief, we are not required to analyze the elements of an ineffectiveness claim in any specific order; thus, if a claim fails under any required element, we may dismiss the claim on that basis.

***Commonwealth v. Treiber***, 121 A.3d 435, 445 (Pa. 2015) (footnote and some citations omitted).

Relating to the reasonable basis prong, generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. Courts should not deem counsel's strategy or tactic unreasonable unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.

***Commonwealth v. Durrett King***, 195 A.3d 255, 259 (Pa. Super. 2018) (quotation marks, brackets and citations omitted).

Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant. The mere failure to obtain an expert rebuttal witness is not ineffectiveness. [The a]ppellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause. **Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony that was presented by the prosecution.** Thus, the question becomes whether or not defense counsel effectively cross-examined the Commonwealth's expert witness.

***Chmiel***, 30 A.3d at 1143 (citations, quotation marks and brackets omitted; emphasis added).

- 4 -

It is undisputed that Dr. Rotolo was able and willing to testify at Melecio's trial. Therefore, our inquiry is limited to whether trial counsel effectively cross-examined the Commonwealth's expert witness. ***See id.***, ***supra***.

In his cross-examination of O'Brien, Attorney Rader elicited the following testimony:

Q. [Attorney Rader:]  Now, I'm going to refer you to Page 2 of 29 of your report, okay?

A. [O'Brien:]  Okay.

Q. And I'm going to be at the last line of that report.  Well, before I get to that, at the top of each page, it's printed – that [*sic*] the [victim]'s description of events, correct?

A. Correct.

Q. And you record exactly what he or she says, correct?

A. Yes.  Correct.

Q. So going back down to that last line, I'm going to read this to you and ask if it's correct, what you wrote: quote, he said he couldn't forgive me.  And he was leaving.  Is that what that says?

A. Yes.

Q. And at the top of Page 3A of 29, I'm going to read this to you and ask if it's correct: we were going back and forth.  I asked him not to leave.  This went on for 20 minutes.  I got up, and headed to the bedroom.  I told him do whatever he wants to do.  Is that what you wrote there?

A. Yes.

….

Q. Now, throughout this examination, you, being an ethical nurse, you noticed or you noted that [the victim] stated that she was in pain; is that correct?

A. Yes, that is correct.

Q. Can you yourself measure pain?

A. I myself, no. We have a scale that we use to measure pain, which is asking the patient from one to ten, one being the minimal amount of pain, ten being the worst pain ever, how would you rate your pain.

Q. So that's subjective. It's based on the patient's feeling?

A. That's correct.

Q. Their feelings?

A. That's correct.

Q. You can't take a photograph of that?

A. No.

Q. Now, the prosecution for the Commonwealth showed you a bunch of those body diagrams?

A. Yes.

Q. And you drew little, whatever -- images on that to the best of your professional ability, correct?

A. Correct.

Q. And that's more or less to note the location of these, what you call, injuries?

A. Correct.

Q. But to get a better accurate depiction, you take a photograph; is that correct?

A. That is correct.

Q. Now, you saw those body diagrams. We saw the front part of the body, the back part of the body. We saw the sides, right and left, correct?

A. Correct.

….

Q. And you note a lot of what you are interpreting to be bruises?

A. Yes.

Q. And you, in fact, you were able to measure them with your scale?

A. Yes.

Q. Is it possible to date those bruises?

A. No, it is not.

Q. So based on your professional experience, you can't tell if that bruise occurred on August 31st, or if it occurred on August 28th or August 29th?

A. No.

….

Q. So Nurse O'Brien, I'm showing you what's been marked as Commonwealth's Exhibit 10. And again, could you describe for the jury what that is?

A. That is a bruise, right there where I have that circled.

Q. Now, what color would you describe that bruise?

A. To be accurate, I'm going to get to my notes. Red/purple.

Q. So that's not what you referred to as an erythema or the redness?

A. No.

Q. And again, you can't determine when that bruise occurred[,] whether it was August 31st or a couple [of] days before?

A. No.

Q. Now, can you tell if a bruise was caused through consensual activity, accidental activity, or nonconsensual activity?

A. Unless we're told, no.

….

Q. Now, you described -- and we saw some photographs of [the victim's] eye area, correct?

A. That is correct.

Q. And you observed or testified that there were certain areas that showed petechial hemorrhages?

A. Correct.

Q. And those petechial hemorrhages are what some laymen refer to as pinpoints?

A. In terms of size?

Q. Yes.

A. Yes, I used the word pinpoint.

Q. And that's as a result of a blood vessel bursting?

A. Correct.

Q. Now, it's your testimony that the cause of that petechial hemorrhage is based on being strangled?

A. That was consistent with what was in the patient history.

Q. If a person is being strangled, are they able to breathe?

A. It depends on how -- it depends on the amount of force and pressure that's applied.

Q. So if a person is being choked or someone's hands are around a person's neck, but they are able to breathe, would they still exhibit signs of a petechial hemorrhage?

A. Yes, it's possible.

Q. If a person was being strangled or choked to the point they could not breathe, would they show more petechial hemorrhages?

A. Most likely. Everybody is different in terms of how their vessels are and that type of thing.

Q. Have you ever been a part of autopsies?

A. No, I have not.

Q. Would you also exhibit potential petechial hemorrhages on the eyelids -- the inside of the eyelids?

A. That's possible, yes.

Q. Are there any other explanations for how a petechial hemorrhage may result?

A. In the eye?

Q. Yes.

A. Yes. Vomiting, excess coughing, those are things that can cause petechial hemorrhages in the eyes.

Q. So you said vomiting, excessive coughing?

A. Yes.

Q. Allergies. How about allergies?

A. I'm not sure that I can answer that question.

Q. How about just crying, if you're crying extensively?

A. No, not typically. Not in my experience.

Q. So something that would cause pressure on your head area?

A. Correct.

Q. Like vomiting or excessive coughing?

A. Correct.

Q. Had you asked [the victim] if she had vomited prior to the examination?

A. Yes. We have a page -- Page 7 of my report. And then -- I apologize -- this is [*sic*] questions that we ask since the assault took place. And then we ask specific questions and one of those questions is about vomiting. And she had indicated since the assault happened that she had not vomited.

Q. Had you asked her if she had coughed excessively at any point after the alleged assault prior to the exam?

A. On the physical part of the exam that we do -- because we also do a physical exam, we go through each section and it's actually on Page 4 of my medical report. And we ask them about -- [] under pulmonary[,] whether there's shortness of breath, coughing, wheezing, or other, meaning anything else in the pulmonary system that was causing her an issue. And that was marked as negative, so she did not have any excessive coughing.

Q. And that's based on her reporting?

A. Correct.

Q. Now, with respect to the petechial hemorrhages on the roof of the mouth --

A. Yes.

Q. -- could those hemorrhages been caused by anything other than what was described by [the victim]?

A. Yes, it could be caused by an object.

Q. Could it be caused by eating hard food item?

A. No, not typically.

Q. Now, you noted on the body diagrams, as far as the genital areas, numerous, what you described as, lacerations?

A. Yes.

Q. Did you measure those lacerations?

A. That's an area that is difficult to measure because the scale that we use is a rigid scale, plus you would not want to bend a scale to alter a measurement -- and being that the pain -- excuse me, the exam was causing her a lot of pain, she wasn't able to completely relax her legs. So I was not able to use a scale and we don't typically use a school [sic].

Q. So the short answer is no, you did not measure the lacerations?

A. Correct.

Q. Now, you testified on direct that when you examined the cervical os or os --

A. Os, O- S.

Q. -- that you noted a bruise?

A. It was actually to the side of the cervical os, and also below it.

Q. Now, was that a bruise or was that bleeding or was that a laceration?

A. There -- in the cervical os itself, which is the little slit there, there was some blood in there.  When we -- when I do the exam, I take a video of it, just how it is. And then once the swabs are collected and the evidence is collected, then I'll take another larger Q- Tip to wipe away any discharge or blood so that I can get a better look at what is actually on the cervix.

Q. Did you do that in this case?

A. Yes, I did.

Q. You also testified on direct that you had not frequently seen that type of injury on the cervix in all the examinations that you've done?

A. Correct.

Q. When you say not frequent, can you give us percentage, a number?

A. Maybe between 10 and 15 percent that I've seen bruising.  And that's taking a guess off the top of my head.

Q. So it's an estimate, right?

A. Yes.

Q. So 10 to 15 percent you had seen that type of injury on the cervix, correct?

A. In my examinations, and I've seen injury on the cervix through educational -- continuing educational things that I've done.

Q. And how many examinations have you done?

A. 502.

Q. So of those 500 exams, you've seen that type of injury on -- if my math is correct -- about 50 of them?

A. It's possible.

….

Q. Now, the small laceration or tears that you observed during your examination in the genital area, could they have been from consensual activity within a five-day period?

A. Could be.

….

Q. So, if you take [the victim]'s statements to you, set them aside, and you observed these bruises, and erythema and the lacerations, can you form an opinion as to whether those were caused by consensual activity, nonconsensual activity, or accidental?

A. It's a difficult way to answer that. I would say with the amount of injury that was there -- well, I guess your answer is no, I can't tell which it is.

Q. And again, you are aware from her history that there was apparently prior consensual activity a couple days before this incident?

A. Yes, I was.

N.T., 9/12/17, 230-46.

On re-cross, Attorney Rader elicited the following relevant testimony:

Q. [Attorney Rader:] You testified on redirect that the bruises that you observed during this examination could have happened within a day?

A. [O'Brien:] Correct.

Q. But again, they could have happened within five days; is that correct?

A. That is correct.

Q. And based on your examination and your experience and training, you noted that the injuries that you observed were consistent with [the victim's] history to you; is that correct?

A. That is correct.

Q. If [the victim] had told you that -- well, it was consensual sex, but it was rather rough sex, would those injuries have been consistent with that history?

A. It would depend on what the history she provided me and what would mean rough sex.

*Id.* at 255-56.

Here, Attorney Rader elicited testimony from O'Brien that she could not determine, based on the nature of the victim's bruises, whether (1) the sexual contact was non-consensual, and (2) the bruising resulted from Melecio's sexual contact with the victim. Therefore, we conclude that Attorney Rader effectively cross-examined O'Brien regarding the information to which Melecio claims Dr. Rotolo would have testified, and Dr. Rotolo's purported testimony would not have furthered Melecio's case. **See Chmiel**, **supra**. Accordingly, Attorney Rader was not ineffective in deciding to not call Dr. Rotolo as a witness, and the PCRA court properly denied Melecio's PCRA Petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/03/2020